CITY OF NEW CARROLLTON *v.* JAMES W.
ROGERS ET AL.

[No. 33, September Term, 1979.]

*Decided February 8, 1980.*

*Motion for reconsideration filed March 10, 1980; denied March 21, 1980.*

58

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ▮ORTH, COLE and DAVIDSON, JJ.

*John R. Foran,* with whom were *Horowitz, Oneglia, Goldstein, Foran & Parker, P.A.* on the brief, for appellant.

*Edward C. Gibbs, Jr.,* and *Russell W. Shipley,* with whom were *Shipley, Knight, Manzi & Zanecki* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

Chapter 863 of the Acts of 1977, now codified as Maryland Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.), Art. 76A, §§ 7-15, and commonly known as the Sunshine Law (the Act), requires that meetings of public bodies, with designated exceptions, be open to the public. The principal issue in this case is whether the Council of the City of New Carrollton (the City Council) violated the Act in conducting certain meetings pertaining to the possible annexation of areas adjoining the city known as the Metro East Triangle (MET) and West Lanham Hills.

(1)

Codified under the subtitle "Meetings of Public Bodies," the Act provides in § 7 that "[i]t is essential to the maintenance of a democratic society that except in special and appropriate circumstances public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." The Act applies only to public bodies "exercising

legislative, quasi-legislative or advisory functions." [1] § 9. By the express provisions of § 9, the Act does not apply to "a public body when exercising executive, judicial or quasi-judicial functions." A *"Public body"* is defined by the Act, § 8 (g), to include the legislative body of a municipality. Section 10 requires that "meetings of every public body shall be open to the public," unless they are authorized to be closed as within enumerated exceptions contained in § 11. A *"Meeting"* is defined in § 8 (f) to mean:

> "the convening of a quorum of the constituent membership of a public body for the purpose of considering or transacting public business. It does not include chance encounters, social gatherings, or other occasions which are not designed or intended for the purpose of circumventing the provisions of this subtitle."

---

1. Section 8 (b) defines *"Advisory function"* to mean:

"the study, evaluation, or the making of recommendations on matters of public concern pursuant to an official delegation of responsibility in the form of a constitutional or charter provision, law, statute, resolution, ordinance, order, rule, regulation, or other formal action by or on behalf of a public body which exercises legislative, quasi-legislative, executive, judicial or quasi-judicial functions, or by the Governor or the chief executive of a political subdivision of the State."

Section 8 (e) defines *"Legislative function"* to mean:

"the approval, disapproval, enactment, amendment or repeal or the process of approving, disapproving, enacting, amending or repealing by any public body of any law, statute, resolution, ordinance, or other measure to set public policy; the approval or disapproval or the process of approving or disapproving by any public body of any appointment; the proposing or the process of proposing by a public body of any Constitution, constitutional amendment, charter, or charter amendment; or the ratification or process of ratifying by any public body of any constitution or constitutional amendment."

Section 8 (i) defines *"Quasi-legislative function"* to mean:

"(1) The adoption, amendment, disapproval or repeal of a rule, regulation, or bylaw having the force of law by a public body, or the process of doing so;

(2) The approval, disapproval, or amendment of a contract or a budget by a public body, or the process of doing so."

Section 12 requires that a public body "give reasonable advance notice of its open meetings." In this regard, the section provides that "[w]henever reasonable under all the circumstances," the notice be in writing and include the date, time and place of the meeting. Section 12 (c) (3) provides that the required notice may be given by posting at a convenient public location at or near the place of the meeting, "if prior public notice has been given that this method will be used." Section 13 requires every public body subject to the Act to keep written minutes of all its meetings, reflecting the items considered and the actions taken, together with any recorded vote. The section provides that the minutes "shall be prepared as soon as practicable under the circumstances," and designates them as public records, open to public inspection. Section 14 provides that any person "adversely affected" by an action in violation of § 10 (requiring that meetings be open to the public) and § 12 (requiring that public notice be given) may file suit to compel compliance "with the provisions of these sections, determining the applicability of these sections, or voiding the action." Section 14 (c) creates a presumption "that the public body did not violate §§ 10 or 12"; it also provides that "the burden of proving a violation is on the complainant." Section 14 (e) authorizes the court to issue an injunction "to determine the applicability of this subtitle to the discussions or decisions of public bodies, or to grant such other relief as may be appropriate." Section 14 (e) (2) authorizes the court to "declare void any final action taken at a meeting held in wilful violation of §§ 10 or 12 . . . if the court finds that no other remedy would be adequate under the circumstances."

### (2)

On October 2, 1978, a number of property owners affected by New Carrollton's proposal to annex the MET and West Lanham Hills sued the City, the Mayor and the City Council, seeking declaratory and injunctive relief. They alleged that beginning at a time prior to August 16, 1978 — the date upon which they claimed that the annexation proposal was first

divulged to the public — the Mayor and City Council "secretly embarked" upon a "positive scheme," consummated by closed meetings held in violation of the Act, to bring about the desired annexation. As a consequence of these "secret meetings," the complainants asserted that they were denied the opportunity to participate in the functioning of government, and to voice their opinions regarding the annexation process when it was in its formative stages. In view of the alleged violations of the Act's provisions, the complainants prayed that the "actions taken by the Mayor and City Council at all closed meetings dealing with the issue of annexation" be declared void and that an injunction be issued prohibiting the defendants from going forward with the annexation process.

The defendants, answering the suit, denied that the City Council and Mayor met in secret sessions in connection with the annexation proposal. They claimed that the challenged meetings of the Council were open to the public and were preceded by public notice, as required by the Act. In addition, the defendants asserted that minutes of the meetings were taken and made available for public inspection.

On October 4, 1978, two days after the plaintiffs had filed their suit, a resolution of annexation was introduced in the City Council to annex the MET, West Lanham Hills, and other designated areas adjoining the City's boundaries. The resolution recited that, as required by Maryland Code (1957, 1973 Repl. Vol.) Art. 23A, § 19, consent for the annexation had been obtained from not less than 25% of the registered voters residing in the areas to be annexed, as well as from the owners of not less than 25% of the assessed valuation of the real property located in the areas to be annexed. As required by § 19, the City Council, on November 21, 1978, held a public hearing on the resolution, adopting it thereafter on January 3, 1979. On February 7, 1979, a petition was presented to the Council to hold a referendum on the resolution, as authorized by § 19 of Art. 23A. On February 13, 1979, in accordance with the provisions of § 19, the Council provided for a referendum to be held on March 17, 1979, thereby suspending the effectiveness of the resolution pending the results of the referendum election.

On March 5 and 6, 1979, the Circuit Court for Prince George's County (Bowen, J.) conducted an extensive evidentiary hearing into the merits of the plaintiffs' action. Evidence was adduced showing that in late 1977 the City's Advisory Planning Committee (APC), an executive-branch agency established within the Mayor's office, was requested to study the annexation of areas adjoining New Carrollton. The APC met on December 8, 1977, January 12, February 9 and March 9, 1978, and discussed various annexation proposals. One of the proposals discussed was the annexation of the MET, a valuable tract of commercial and industrial properties adjoining New Carrollton's boundaries. The APC meetings were open to the public, and minutes taken at these meetings disclosed in a general way that annexation proposals were discussed. Neither the City Council nor any of its members attended these meetings.

On March 16, 1978, a "Special Workshop" meeting of the City Council was convened at the request of the Mayor for the purpose of considering the subject of annexation. Notice of the meeting was posted on the bulletin board at City Hall. It stated:

> "The City Council will meet in a Workshop Session at 7:30 P.M. on Thursday, March 16, 1978, at City Hall.
>
> The following topic will be discussed:
>
> I. Annexation proposal."

The meeting was attended by a quorum of the City Council, the Mayor, his administrative officer, and members of the West Lanham Hills Citizens Association (WLHCA), who had been invited to attend the meeting. The minutes of the meeting disclosed that the APC annexation study was discussed, together with various aspects and implications of the annexation process. Specific reference was made in the minutes to "the possible annexation of West Lanham Hills and the Metro Triangle." The minutes also indicated that the President of WLHCA stated that he looked with favor upon such an annexation proposal and would discuss it with his Board of Directors.

The City Council held another "Special Workshop" meeting on March 23, 1978 at City Hall. Public notice of the date, time and place of this meeting was posted on the bulletin board at City Hall; it was identical in format to the notice posted for the March 16 meeting. As before, the notice announced that the topic to be discussed at the meeting was "Annexation proposal." A quorum of the City Council was present, together with the Mayor, his administrative officer, and invited officers and directors of WLHCA. Minutes taken at the meeting reflected that WLHCA had voted on March 19 in favor of the annexation and "requested the City Council to proceed with the necessary procedures."

The posting of public notice of the Council's meetings of March 16 and 23, 1978 on the bulletin board at City Hall was in accordance with § 12 (c) of the Act, which authorized this method of giving notice "if prior public notice has been given that this method will be used." Consistent with this requirement, the City, on July 28, 1977, in two county newspapers, had given "Public Notice" that pursuant to the requirements of the Act, "notice of scheduled meetings of the City Council, special and workshop sessions, and meetings of citizen advisory committees will be posted in a timely manner on the first floor bulletin board in City Hall, 8511 Legation Road, New Carrollton, Maryland." [2]

Following the Council's workshop meeting of March 23, the City Attorney was directed to obtain a survey of the areas to be annexed — an essential step where annexation is to be initiated by resolution of the legislative body.[3] Pending receipt of the completed survey, the APC continued its study of annexation in open meetings held in April and May of 1978. The public minutes of these meetings indicate that the APC

2. The City Charter requires that the Council meet on the third Wednesday of each month "and at such other times as may be required to conduct the business of the City." § 3 (d). The Council holds two regularly scheduled meetings each month, on the first and third Wednesdays, and two "workshop" meetings per month, generally on the Monday preceding the regular Council meeting. The Council also holds "special workshop" meetings as may be needed. The regular meetings are held on the second floor of the City Hall, in a large room, while the workshop meetings are held in a conference room on the first floor of the building.

3. *See* Art. 23A, § 19 (b).

recommended that a flyer be prepared as soon as possible to advise the citizenry of the benefits and implications of annexation, together with a "fact sheet" outlining the finances and costs of the annexation process. The minutes took note of the fact that a survey of the areas to be annexed had been ordered.

The survey was completed on June 21 at a cost of $8,000. The Council met that month and amended the existing City budget item for "legal expenses" to make funds available to pay the expense of the survey. Questioned by a citizen with respect to the nature of the increased legal expenses, the Council explained that it was due to a "positive ongoing action" and that it was not then advisable to give further information on the subject.

At a workshop meeting of the Council held on July 31, for which public notice was duly given, the Council suggested, according to the minutes of the meeting, that as soon as possible "an informational forum for residents of the City [be arranged] to explain the annexation proposal under consideration." On August 5, the City prepared and distributed a flyer to the homes of New Carrollton's residents, announcing that a special informational meeting would be held by the Mayor and City Council on August 8 at City Hall "to present a proposal to annex the New Carrollton (METRO) Triangle and adjacent areas into the City of New Carrollton." Accompanying the flyer was a "fact sheet" outlining the demographics of the areas under consideration. All residents were urged by the flyer to attend the meeting.

On August 7, 1978, at the invitation of the WLHCA, the Mayor and members of the City Council attended a meeting in West Lanham Hills for the purpose of answering questions that the residents might have about New Carrollton. No notice of this meeting was posted on the bulletin board at City Hall. On August 8, the Council held the "informational meeting" which it had previously scheduled to inform New Carrollton residents about the annexation proposal. On August 16, 1978, the Council discussed the annexation proposal at a regularly scheduled meeting, for which public notice was given.

Joseph Aukward and James Rogers, two of the plaintiffs, testified in support of their allegations that the Council had conducted its annexation business in secret meetings, closed to the public, in violation of §§ 10 and 12 of the Act. Aukward said that on every occasion that he attempted to attend Council workship meetings, the doors to City Hall were locked. This, he said, was in contrast to the Council's regular meetings, which were always open to the public. Aukward's testimony was specific only as it related to workshop meetings held at some time between June and August of 1977. Rogers testified to workshop meetings at which the doors were locked in April or May, without specifying the year, and to a "recent meeting" held on October 2. He said he tried to attend four workshop meetings but always found the doors locked. Both witnesses indicated that they were able to gain admittance to workshop meetings by rapping on the door or window. Rogers said that he had been told by the Mayor that admittance to Council workshop meetings was by invitation only.

Several Council members testified that there had been times when the doors to City Hall were locked during workshop sessions, although no particular time was specified. This was attributed either to inadvertence or to a need to prevent vandalism. One councilman testified:

> "We have a very conscientious person who takes care of the City Hall. Call him a maintenance man, but he is young. And we meet in the back room and he has to go upstairs sometimes, so he will lock the doors. He is afraid something might be stolen, because we never — we seldom go in the other room. And so they may have been locked, but they were never intentionally locked to keep out anybody. In the last eight and a half years I have served I have never had the doors locked intentionally."

A councilwoman testified that she knew of several occasions when the janitor locked the doors during a workshop meeting. She explained:

> "I think a time or two when the janitor maybe was

cleaning upstairs, and there's been a problem with kids coming in, the restrooms have been vandalized. And if the janitor, the boy who works there, would not be in the outer office perhaps that's the reason he locked it, because there's a lot of problems with the kids from the playground coming across and using the drinking machine. And if they are rattling around out there, I believe that was his reason maybe for locking them to keep — it was not to keep anybody out."

Neither Aukward nor Rogers attempted to attend the March 16 and 23 special workshop meetings of the Council. The defendants' witnesses all testified that these particular meetings, as well as the Council's other meetings, were open to the public.

Testimony was adduced by the plaintiffs showing that various members of the Council and the Mayor had told others of a need to keep the annexation proposal as quiet as possible, not to broadcast or advertise it, to keep it "low key" or confidential, until the process of annexation could be completed.

### (3)

At the conclusion of the evidence, the trial judge delivered an extended oral opinion. He said that the notice of the Council's workshop meetings of March 16 and 23 was deficient because there was no "plain statement that this type of meeting is open to the general public." He concluded that use of the term "workshop session" in the notice led the public to believe that these meetings were private or closed. He referred to a "time-honored custom" in New Carrollton that workshop sessions were closed, while regularly scheduled Council meetings were open to the public. Accordingly, the trial judge found as a fact that the workshop meetings of March 16 and 23 were held in violation of §§ 10 and 12 of the Act.

The trial judge found from the evidence that the doors to the Council's workshop sessions were locked. He referred to

testimony of the plaintiff Aukward that the doors to workshop sessions that he attempted to attend were locked on three occasions over a three-year period. From this testimony, the trial judge reasoned that the doors must have been locked at all Council workshop meetings. He said that this was "a condition which had existed for some time, that it was well known, and that ... if anybody showed up and persisted in rapping he would be admitted." "But that doesn't make an open meeting," the court said, "because having to come up and rap on the door ... exerts a chilling effect on the public's participation in what is going on behind the locked door."

The trial judge found from the evidence "that there was a tacit and well understood agreement between all concerned that no mention would be made of ... [the annexation proposal], if possible, until as much agreement had been arranged as could possibly be arranged." The court found "as a fact ... that there was a plan, encouraged by ... the City government, legislative and executive, to conduct whatever was done in the way of advice, study, information, in as low key a way as possible and with an absolute minimum of exposure to anybody's knowledge, outside of the officials of each of the groups that were dealing with it and that that persisted to the very last when everybody was ready to go public and make a public pronouncement." Evidence of the plan to keep the annexation proposal cloaked in secrecy was provided, the trial judge said, by the Council's refusal to explain at its June 1978 budget meeting that an expense item of $8,000 was in fact incurred for a survey of the areas proposed for annexation. This was "a very significant piece of evidence," the court said, which established "that there was a motive for keeping this quiet."

The trial judge stated that the Council must receive the "end product" of studies and reports made by other agencies at a public session, and that the first public disclosure of the annexation proposal was at the Council's regular meeting of August 14, 1978. The court's conclusion was that "the business of this annexation was in fact transacted at meetings which were not open to the public ... and that the

action ultimately taken [the enactment of the annexation resolution] . . . grew out of that original series of non-public transactions."

On March 12, 1979, the court entered an order declaring that the defendants, "in the conduct of that portion of [their] business pertaining to the [proposed] annexation . . . failed to conduct [their] meetings in accordance with the provisions and requirements of Section 10 and Section 12 [of the Act]." The order recited that the meetings and deliberations which violated the Act's provisions commenced with the Council's meeting of March 16, 1978 and extended to the meeting of August 16, 1978, a period of 153 calendar days. The order further specified that "[t]o assure that no advantage accrues to or disadvantage is caused to any of the persons, organizations or political entities involved with or having an interest in the question of annexation," the 153-day period would be "added to the date upon which this matter could have been considered at a public meeting which qualified under the statute for the purpose of any calculation of votes or consents required by law having an effect on the annexation question." The order directed that January 13, 1979 would be the date of such calculation for purposes of further annexation proceedings. The defendants appealed, and we granted certiorari prior to decision by the Court of Special Appeals to consider whether, in view of the evidence presented, the trial court erred in holding that §§ 10 and 12 of the Act had been violated.

(4)

We think the trial judge erred in concluding that the workshop meetings of March 16 and 23, which he deemed of such critical importance, were neither properly noticed nor open to the public. Nothing in § 12 requires that the notice contain a specific statement that the meeting is open to the general public. The section requires only that the public body give "reasonable advance notice [written if reasonably possible] of its open meetings," including the date, time and place of the meeting. As disclosed by the evidence, the Council

met these statutory prerequisites in posting advance written notice of its workshop meetings of March 16 and 23 on the City Hall bulletin board (together with the subject matter of the meeting), in accordance with its earlier notice, published in two newspapers in compliance with the Act, that it would use this method of informing the public of these meetings. The record is replete with exhibits containing public notice of Council meetings, workshop and regular, posted on the City Hall bulletin board, commencing shortly after the Act's effective date of July 1, 1977, so that whatever its past practice may have been, the Council gave due public notice of its meetings as required by the Act once it took effect. We think the obvious purpose and effect of such a posted notice is to invite the public to attend, and we view with incredulity the plaintiff Aukward's testimony that although he saw the notices posted on the bulletin board, he did not know what they meant. That the meetings of March 16 and 23 were "workshop" rather than regular meetings does not require a specific invitation to the public to attend in order to constitute a valid notice under § 12. We hold, therefore, as to the workshop meetings of March 16 and 23, that the requisite statutory notice was given under § 12.

Of course, to give notice of a meeting of the public body, and then intentionally prevent the public from attending, would constitute a gross violation of the Act, as the trial judge held. Indeed, any action taken by the public body which discourages public attendance at the meeting to any substantial degree would likely violate the Act's provisions. The locking of doors, for example, even for legitimate security purposes, would normally violate the Act's provisions. It is, however, "presumed" under § 14 (c) of the Act that the public body gave the requisite notice of the meeting and afforded the general public the right to attend. The subsection also specifies that "the burden of proving a violation is on the complainant."

We think the vague and unparticularized evidence adduced at the trial was legally insufficient to overcome the presumption of compliance with §§ 10 and 12 and establish that the public was excluded from the meetings of March 16

and 23, or indeed from any other Council meetings between the critical period of March 16 to August 16, 1978. The evidence shows that neither plaintiff Aukward nor Rogers attempted to attend the meetings of March 16 and 23. Nor did it show that any member of the public attempted to attend these meetings but was excluded. The only specific evidence in the case is that all Council meetings between March 16 and August 16, 1978 were open to the public. That some of the Council's workshop meetings, held prior to the effective date of the Act, may have been closed to the public by "time-honored tradition" is of little significance in the face of evidence that, after the Act's passage, the meetings were open to the public. That the doors to workshop meetings may have been locked at some time other than at the meetings of March 16 and 23, unspecified by the evidence either as to time or circumstances, does not, without more, overcome the presumption that these meetings, and all others, held up to August 16, 1978, were open to the public.

In his oral opinion, the trial judge expressed the belief that the annexation proposal, from beginning to end, was cloaked in secrecy. But as the evidence reveals, the annexation studies conducted by the APC, and the Council's later involvement in the annexation process, beginning on March 16, 1978, were not conducted in secret but at open meetings at which minutes were taken and made available for public inspection. While it may have been that members of the Council and the Mayor believed that it was in the City's best interest that the annexation proposal not be unduly highlighted so as to invite opposition, the fact remains that the proposal was considered by the Council at public meetings held in compliance with §§ 10 and 12 of the Act.

That the Council at a June, 1978 regular meeting amended the "legal expense" item in the budget to cover the survey fee and did not disclose the details to an inquiring citizen does not warrant the inference drawn by the trial judge that the Council's meetings of March 16 and 23 and all others at which annexation was considered were conducted in secret. The evidence in the case is plainly to the contrary. The Council's workshop meeting of July 31, 1978, at which the annexation

proposal was under consideration, was not even alleged to have been closed to the public. The informational "flyer" distributed to the citizenry of New Carrollton on August 5, 1978, announced that a special meeting would be held on August 8 at City Hall "to present a proposal to annex the New Carrollton (METRO) Triangle and adjacent areas into the City of New Carrollton." Nothing underhanded or clandestine concerning this notification and public meeting is either alleged or established. Nor was there anything sinister or illegal about the invited attendance of the Mayor and members of the Council at the August 7, 1978 meeting in West Lanham Hills for the purpose of answering questions that the residents might have about New Carrollton. Public notice of this event was not required by the Act to be given to the citizens of New Carrollton since, as we view it, it was not a "meeting" of the public body but rather, within the contemplation of § 8 (f), was an "[occasion] . . . not designed or intended for the purpose of circumventing the provisions of this subtitle."

Moreover, there was no evidence, legally sufficient, to justify the conclusion reached by the trial judge that there was a plan to conduct the annexation process in secret and not disclose it to the public until it was largely completed. The trial judge's conclusion that the first public exposure of the annexation plan was at the Council's regular meeting of August 16, 1978 is totally at odds with the evidence. On the record before us, we hold that there was no evidentiary justification to support the judgment of the lower court that the Council, from March 16, 1978 to August 16, 1978, conducted its business pertaining to annexation in violation of the Act's requirements. That it may have been the desire of some members of the Council and the Mayor to conduct the process of annexation in a "low key" manner, and that they may have expressed this desire to others, does not warrant the inference that as a body the Council deliberated in secret at closed meetings.

In so concluding, we note that the heart of the Act is found in the public policy declarations of § 7, *i.e.,* that "public business be performed in an open and public manner and that

the citizens be advised of and aware of the performance of public officials [when exercising legislative, quasi-legislative or advisory functions] and the deliberations and decisions that go into the making of public policy." That commitment is secured by the provisions of §§ 10 and 12 which require that notice of meetings be given and that the meetings be open to the public. While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well to all deliberations which precede the actual legislative act or decision, unless authorized by § 11 to be closed to the public. The Act makes no distinction between formal and informal meetings of the public body; it simply covers all meetings at which a quorum of the constituent membership of the public body is convened "for the purpose of considering or transacting public business." § 8 (f). It is, therefore, the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business. In this regard, the Supreme Court of Florida, in *Town of Palm Beach v. Gradison,* 296 So. 2d 473 (1974), construing that state's open meeting law, observed:

> "One purpose of the government in the sunshine law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other

authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken." 296 So. 2d at 477.

*Accord, Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs.,* 263 C.A.2d 41, 69 Cal. Rptr. 480 (1968); *Orange City Publications v. Council of City of Newburgh,* 60 A.D.2d 409, 401 N.Y.S.2d 84 (1978).

These precepts were not violated by the Council in this case. On the contrary, it gave proper public notice of its meetings involving the annexation proposal, and afforded the public the right to attend both regular and workshop meetings at which the proposal was considered preliminarily to the introduction by the Council of its annexation resolution on October 4, 1978. Since the evidence fails to demonstrate a violation of the Act's provisions, the lower court was manifestly in error; its order must therefore be vacated and the referendum election on the annexation resolution permitted to proceed forthwith.

> *Order vacated; case remanded to the Circuit Court for Prince George's County for the entry of a declaratory judgment consistent with the views expressed herein; costs to be paid by the appellees.*