724 A.2d 717

**ANDY'S ICE CREAM, INC.**

**v.**

**CITY OF SALISBURY, et al.**

**No. 80, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 24, 1999.

126

128

**130**

Alfred L. Scanlan, Jr. and Timothy C. Lynch (Scanlan, Rosen & Shar, LLC, Batimore, Robin R. Cockey and Cockey, Brennan & Maloney P.C., Salisbury, on the brief), for Appellant.

Robert A. Eaton of Salisbury, for appellee, City of Salisbury. William J. Chen, Jr. (Chen, Walsh, Tecler & McCabe, LLP, Rockville, on the brief), for Appellee, Salisbury Zoo Comm. (Donald C. Davis and Perdue, Rayne, Davis & White, Salisbury, on the brief), for Appellee, Flannery's Inc.

Argued before WENNER, DAVIS, and KENNEY, JJ.

KENNEY, Judge.

Appellant/cross-appellee, Andy's Ice Cream, Inc. ("Andy's"), bid unsuccessfully for a contract to sell food in an area within the City Park adjacent to the Salisbury Zoo. Andy's asserts that the Salisbury Zoo Commission, Inc. (the "Zoo Commis-

sion"), which made the contract decision, is both a public body and a unit or instrumentality of the City of Salisbury (the "City"), which, in turn, is a political subdivision of the state government. Based upon this assertion, Andy's contends that the Zoo Commission, during its review of the contract bids, should have complied with both the Public Information Act,[1] Md.Code (1984, 1997 Cum.Supp.), §§ 10–611 to 628 of the State Government Article ("S.G."), and the Open Meetings Act, Md.Code (1984, 1997 Cum.Supp.), S.G. §§ 10–501 to 512, which, respectively, detail procedural requirements for public access to government documents and to the meetings of public bodies. Andy's also argues that the City improperly delegated to the Zoo Commission the authority to award the contract.

Andy's sought a declaratory judgment and an injunction against the Zoo Commission's decision to award the contract to Flannery's, Inc., the successful bidder. All parties sought attorneys' fees. After a hearing on cross motions for summary judgment, the Circuit Court for Wicomico County ruled for Andy's on the Public Information Act issue, and for the City, the Zoo Commission, and Flannery's on the issues of delegation and the Open Meetings Act. No party was awarded attorneys' fees. Andy's appeals from the delegation, Open Meetings Act, and attorneys' fees decisions; the City and Zoo Commission appeal from the Public Information Act and attorneys' fees decisions. Flannery's, an appellee to Andy's appeal, has not appealed.

### Facts

In 1983 Walter Anderson, the City's Solicitor at the time, filed Articles of Incorporation creating a non-profit, non-stock corporation to be called the "Salisbury Zoo Commission, Inc." The Articles named Patrick Fennell, the City's Executive Secretary, as Resident Agent, and listed the City's "Govern-

---

1. Unlike the Open Meetings Act, the Public Information Act does not derive its title from a statutory provision, but rather from common practice. We will utilize the commonly used title.

ment Office Building" as the Resident Agent's address.[2]

The Zoo Commission's Articles provide that "[t]he members of the Corporation shall be appointed by the Mayor and City Council and shall ... include a member of the City Council." The Zoo Commission's By–Laws and Articles both identify its purpose as: "[t]o assist the City of Salisbury in the *operation, management and promotion* of the Salisbury Zoological Park as a wildlife conservation facility for the enjoyment and education of the citizens of the City of Salisbury and the regional area...." (Emphasis added.) The By–Laws specify a non-exclusive list of the Zoo Commission's functions, including: retaining persons or organizations to provide consultation or assist in the Zoo's operation; planning, recommending, and funding new Zoo exhibits and improvements, in collaboration with the City's Department of Public Works; soliciting, training, and managing volunteers for the Zoo's educational programs; raising funds and encouraging monetary contributions to the Zoo; developing, funding, and managing publicity programs; maintaining an accurate inventory of the animal collection; managing Zoo Commission funds for the purchase and sale of animals as personal property of the Zoo Commission; collaborating with professional Zoo staff in the acquisition, care, breeding, and disposition of the animals; and recommending to the Mayor and City Council long-term plans and improvements to the Zoo.

---

2. The record does not indicate the initial impetus for the creation of the Zoo Commission, or why Mr. Anderson and Mr. Fennell were involved. The Executive Secretary, Mr. Fennell, was appointed by the Mayor and City Council, and served at their pleasure. His duties were to

represent the Mayor in all matters of day-to-day administration. In this connection he shall exercise all administrative powers and authority delegated to him by the Mayor.... [T]he Mayor, in his discretion, may appoint the Executive Secretary as head of any one of the departments.... Except as provided by this Charter, no duties, functions or powers shall be assigned to or removed from the Executive Secretary by the [City] Council.

Salisbury Charter, Article IV, § SC4–2 (1959 Code, sec. 306.1951, ch. 534, sec. 25) (applicable in 1983; amended in 1986, in part, to change title to "Executive Officer").

The By–Laws and Articles provide that the Mayor and City Council appoint the members of the Zoo Commission for three-year terms, and can remove them.[3] For new appointments and vacancies, the Zoo Commission "shall submit a list of names to the Mayor and City Council *for consideration for appointment* and in order to fill any vacancy." (Emphasis added.) The members of the Zoo Commission, during the events that gave rise to this case, were appointed by the Mayor and City Council in December 1996, pursuant to Resolution No. 549.

The By–Laws state that the Zoo Commission shall have a Board of Directors composed of at least five voting members, who shall elect a Chairman. The City's Director of Public Works and the Zoo Director are ex-officio members. The Zoo Commission Chairman and the board member who is also on the City Council are to act as liaisons between the Zoo Commission and the City.

Andy's avows that the Zoo Commission is funded principally by hotel room taxes assessed by the City; in turn, the Zoo Commission states in its brief that "[t]he record does not show that it [the Zoo Commission] receives any funding from the City." The record extract does not resolve this possible factual dispute, but the Zoo Commission's By–Laws, written on City of Salisbury letterhead, dictate that the Zoo Commission shall present an annual budget to the City Council "consistent with the City of Salisbury procedures on budgets," from which "[a]ny major departures . . . shall be approved by the Mayor and [City] Council"; shall be audited by an auditor selected by and at the expense of the City; and shall submit meeting minutes to the City "to be summarized in the Quarterly Report."[4]

---

3. The Mayor, with the advice and consent of the council, also appoints the heads of all city offices, departments and agencies. Salisbury Charter § SC3–4.C.

4. In its brief, Andy's also asserts that the Zoo Commission "is listed as a City agency on a printout of such agencies distributed by the City to the

Any changes that Zoo Commission members suggest in the By–Laws or Articles must be submitted to the Mayor and City Council for approval. The Mayor and City Council, however, have the independent power to "make, alter, and repeal" the By–Laws. The Zoo Commission may be dissolved by the Mayor and City Council, or by its own members. Upon dissolution, all funds and property would pass to the City. Although the Zoo Commission asserts that "the activities and decision-making authority of the corporation [the Zoo Commission] are not subject to the control of the Mayor and Council," the By–Laws state that "[t]he Mayor and City Council shall have veto power over proposals presented for approval by the Corporation."

In July 1996, the City awarded a license to Andy's, the sole bidder, to sell ice cream and food in the City Park adjacent to the Zoo. The ordinance granting that license apparently expired on October 31, 1996. In March 1997, the City's Purchasing Agent,[5] using a City Purchasing Department form, issued a "Request for Proposals" for concession services "in the City Park at the Zoo," to be received "by the City" in the Government Office Building. The request was entitled "Advertisement—City of Salisbury." In the Request for Proposals documents, the Zoo Commission was rarely mentioned separately from the City; rather, they generally appeared together either as "the City and the Zoo Commission" or as "the City/Zoo Commission." The Zoo Commission is mentioned separately, however, as the party that will evaluate all proposals.

---

general public." The Zoo Commission and the City do not dispute this assertion, and the record appears to support it.

5. The City Charter provides that "[u]nder the supervision of the Mayor and Council, the [City] Purchasing Agent shall make all city purchases and sales and shall make or approve all city contracts ... [subject to exceptions inapplicable here]." Salisbury Charter § SC16–1B. In addition, the City "in every instance shall reserve the right to reject any or all bids, waive any irregularities and make the award in the best interest of the City." Salisbury Charter § SC16–3B.

The bid request included a discussion of a bidder's compliance with the City's Equal Employment Opportunity policy and stated that "the relationship of Vendor [the successful bidder] to City of Salisbury/Salisbury Zoo Commission shall be that of an 'independent contractor.'" The instructions also stated that the Zoo Commission, in its evaluation of the bids, would consider the bidders' performance records in contracts with the City and "[p]revious and existing compliance with laws and ordinances relating to contracts with the City...."

In a March 20, 1997 memo to the Mayor and City Council, John Pick, the City's Executive Officer, addressed the concession issue in his "Management Report" about various City concerns:

*Request for Proposals—Zoo Concession Stand*

The Purchasing Department has released the Request for Proposals (RFP) for the Concession Stand at the Zoo *based on the guidance given by the Council* at your March 12 work session. Responses are due on Monday, April 14 at 10:30 a.m. The Purchasing Department is making an effort to make sure that notification is made to a wide range of individuals and companies ... so that we receive competitive proposals. If any member of the Council knows of anyone who may be interested in submitting a proposal, please contact the Purchasing Department.

*Pursuant to the direction given by the Council,* a number of changes and clarifications were made in the RFP before it was issued. Some of the most significant are:

a) the RFP has been changed to clarify that the Zoo Commission is the party that will be awarding the contract....

c) a sentence has been added clarifying that, *in the event the City has to suspend or terminate the contract,* the vendor will not be paid for the loss of anticipated revenues.... [Emphasis added.]

In April 1997, two food-service corporations, Andy's and Flannery's, Inc., submitted proposals. On April 16, the Zoo

Commission held a closed meeting, during which it decided to award the concession to Flannery's.

On April 28, 1997, the Mayor and City Council approved a resolution leasing a 4,795.31 square foot area in the City Park near the Zoo to the Zoo Commission for $1.00 a year, to be used for concession sales. The City Council minutes indicate that revenue from the Zoo Commission's vending arrangement would go to the Zoo's Education Department. At the same meeting, the Zoo Commission's Chairman, Ronald Alessi, informed the City Council that the Zoo Commission had reviewed two bids for the food service contract and had chosen Flannery's. Apparently, the Zoo Commission reviewed the bids and chose the winning bid before obtaining the lease from the City. The lease between the City and the Zoo Commission was executed on May 5, 1997.

After the Zoo Commission chose Flannery's bid, Andy's apparently requested information about the grounds for the bid decision. Unsuccessful in this endeavor, Andy's filed suit against the Zoo Commission, the City, and Flannery's on June 27, 1997.

### Discussion

We have re-ordered, re-phrased, and consolidated the questions raised by the parties.

Andy's presents these questions: [6]

1. Is the Salisbury Zoo Commission a public body whose meetings must be open to the public under the Open Meetings Act?

2. Can the Salisbury Zoo Commission make a final decision awarding a concession franchise on municipal land?

The Zoo Commission and the City of Salisbury raise the following additional questions:

---

6. Andy's also sought attorneys' fees, but did not include that issue among its questions presented. We will consider all parties' requests for attorneys' fees in the same section of this opinion.

1. Did the circuit court err in ruling that the Zoo Commission was an instrumentality of State Government or of a political subdivision required to produce records under the Public Information Act?

2. Was the circuit court correct in denying all parties' requests for attorney's fees?

We will address these in a different order, considering first the Public Information Act issue, and then the issues concerning the Open Meetings Act, delegation, and attorneys' fees.

■ Maryland Rule 8–131(c) provides that, for actions tried without a jury, an appellate court will review the case on both the law and the evidence, and will not set aside the trial court's judgment on the evidence unless clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. When a trial court makes conclusions of law based on findings of fact, however, the clearly erroneous standard does not apply; instead, the standard of review is whether the trial court was legally correct. *Himelstein v. Arrow Cab,* 113 Md.App. 530, 536, 688 A.2d 491 (1997), aff'd, 348 Md. 558, 705 A.2d 294 (1998).

## I. The Public Information Act

### A. The disposition of the Public Information Act claim

The Public Information Act, S.G. § 10–611 to 628, addresses access to public records. Section 10–613(a) provides that "[e]xcept as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time." Section 10–611(g)(1) states: [7]

'Public record' means the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the

---

7. Prior to September 1, 1997, S.G. § 10–611(g) was designated S.G. § 10–611(f). The current 10–611(g) is identical to the former 10–611(f), and we will use the current notation.

unit or instrumentality in connection with the transaction of public business; and

(ii) is in any form, including:

1. a card;

2. a computerized record;

3. correspondence;

4. a drawing;

5. film or microfilm;

6. a form;

7. a map;

8. a photograph or photostat;

9. a recording; or

10. a tape.

In the circuit court, the Zoo Commission and the City argued that the Zoo Commission is neither a "public body" under the Open Meetings Act nor a "unit or instrumentality of ... a political subdivision" under § 10–611(g)(1)(i) of the Public Information Act. After discussing the Open Meetings Act's definition of "public body," the trial court stated:

The Public Information Act does not use the same definition. I think under the Public Information Act we are dealing with a different definition and a different set of rules and regulations, and the issue is whether or not the Zoo Commission is an instrumentality of the state government within the meaning of the Public Information Act....

Here, you have an agency that is established true by as [sic] a private corporation under the General Corporation Act, however, its governing body is appointed by the Mayor and City Council.

It certainly does serve a public purpose in this Court's mind. Its existence depends upon the City of Salisbury government, and I believe that it is an instrumentality of the state government for the purposes of the Public Information Act, and I would order that the Zoo Commission is

responsible for turning over the minutes and tape as requested.

After the trial judge ordered the Zoo Commission to provide tapes and minutes of the April 16 closed bid evaluation meeting, counsel for the Zoo Commission stated that such tapes or minutes did not exist.

### B. Applying the Public Information Act to the Zoo Commission

In order to resolve any future issues, despite the apparent nonexistence of any minutes or tapes of the April 16 executive session, we shall examine whether the Public Information Act applies to the Zoo Commission. The dispositive issue is whether the Zoo Commission is a "unit or instrumentality ... of a political subdivision" of the State under S.G. § 10–611(g)(1)(i). In *A.S. Abell Publishing Co. v. Mezzanote,* 297 Md. 26, 35, 464 A.2d 1068 (1983), the Court of Appeals discussed the standard for determining which statutorily established entities are subject to the Public Information Act:

This Court has repeatedly recognized that there is no single test for determining whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose. All aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status. *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 510, 397 A.2d 1027, 1031 (1979) (sovereign immunity); *O & B, Inc. v. Maryland–National Capital Park & Planning Comm'n,* 279 Md. 459, 462, 369 A.2d 553, 555 (1977) (sovereign immunity).... In each of these cited cases, this Court held that a statutorily-established entity was an agency or instrumentality of the State, notwithstanding the fact that the State did not exercise control over all aspects of the entity's operation. These cases demonstrate that complete control—control over all aspects of an entity's operation—is not a determinative factor in characterizing a statutorily-established entity as an agency or instrumentality of the State. Rather, a number of factors, including the degree of

control by the State over the entity, must be taken into account.

Moreover, this Court has previously rejected the contention that the sole test to be applied in characterizing a statutorily-established entity as an agency or instrumentality of a government is whether the entity is subject to its complete control. [Citations omitted].

■ Certainly the Zoo Commission is not a statutorily established entity, but the analysis is instructive. In its brief, the Zoo Commission argues that it is not a unit or instrumentality of a political subdivision, as considered by S.G. § 10–611(g)(1)(i), because it is a charitable non-stock corporation that "certainly does not provide any governmental service to the public." We discern no error, however, in the trial court's conclusion that the Zoo Commission is subject to the Public Information Act. The Zoo Commission's many ties to the City, as set forth above, and which will be discussed at greater length in our analysis of the Open Meetings Act issue, indicate that the Zoo Commission is an instrumentality of the City.

In *A.S. Abell,* the Court of Appeals considered whether the Maryland Insurance Guaranty Association (MIGA) was an agency or instrumentality of the State of Maryland under the version of the Public Information Act then in effect. The statute was, in pertinent part, identical to the current Public Information Act, except that the current "unit or instrumentality" replaced "agency or instrumentality" in the section detailing the entities subject to the Act. MIGA was a non-profit unincorporated entity created to "provide a mechanism for the prompt payment of covered claims" when insurers were insolvent, to detect and prevent insolvencies, and to assess the cost of such payments and protection.

The Court of Appeals determined that "MIGA was established by the General Assembly so that its existence is subject to legislative control. It was established for a public purpose and has the obligation to protect ... [among others] the public.... MIGA can be effectively controlled by the State because its Board is not self-perpetuating." *A.S. Abell,* 297

Md. at 37–38, 464 A.2d 1068. Although MIGA's Board of Directors elected its Chairman, the State Insurance Commissioner (the "Commissioner") appointed the Directors and filled vacancies on the Board.

MIGA's "plan of operation, consisting of various rules and regulations establishing all of its procedures," was subject to the Commissioner's approval and amendment. *Id.,* 297 Md. at 38, 464 A.2d 1068. The Board could not delegate certain regulatory powers without the Commissioner's approval. The Commissioner could entertain appeals from final actions of MIGA's Board and could change the Board's decisions. Although all insurers were required to be members of MIGA, it was the Commissioner, not MIGA, who had the authority to revoke an insurer's license to operate if the insurer did not pay an assessment or comply with MIGA regulations. In addition, the General Assembly exempted MIGA from state and local taxes, other than property taxes, and excused MIGA from liability for actions stemming from its performance of its duties. The Court of Appeals held that "MIGA's existence depends upon the General Assembly" and that, although "the State does not exercise control over all aspects of MIGA's operation," the State's control was sufficient for MIGA to be subject to the Public Information Act. *Id.*

Although the Zoo Commission differs in some ways from MIGA, the two entities share similar attributes, and the interrelationship of the Zoo Commission with the City satisfies the standard that the *A.S. Abell* Court set for the application of the Public Information Act. Like MIGA, the Zoo Commission "is not authorized to manage its affairs independent of government control," *A.S. Abell,* 297 Md. at 38, 464 A.2d 1068, in that the Mayor and City Council have veto power over the Zoo Commission's proposals. The Zoo Commission has to submit its budget to the Mayor and City Council, and the Mayor and City Council have to approve any major departures from that budget. The Zoo Commission, like MIGA, is composed of members appointed by a governmental body or executive. Just as MIGA's "plan of operation" is "subject to approval and amendment by the Commissioner," the Zoo

Commission's By–Laws can be changed unilaterally by the Mayor and City Council, whereas any change the Zoo Commission's members propose for the By–Laws requires the approval of the Mayor and City Council. The Mayor and City Council may dissolve the Zoo Commission.

In *A.S. Abell*, the Court of Appeals distinguished MIGA from the Board of Governors of the Memorial Hospital of Cumberland, which the Court had held was an agency of the City of Cumberland, and subject to the version of the Public Information Act then in effect. *Moberly v. Herboldsheimer*, 276 Md. 211, 345 A.2d 855 (1975). The Board of Governors was created by the General Assembly, but apparently had the ability to select its own new members, as well as the authority to select the land for the Hospital, direct its construction, and make all rules and regulations necessary for its management and operation. *Id.*, 276 Md. at 214–216, 345 A.2d 855. The Board of Governors was authorized to do these tasks "as fully as if incorporated for such purposes. . . ." *Id.*, 276 Md. at 216, 345 A.2d 855. Despite this authority, the Board of Governors was still subject to the Public Information Act.

Unlike the Board of Governors in *Moberly*, the Zoo Commission is not self-perpetuating. The Mayor and City Council of Salisbury appoint the Zoo Commission's members, and can dissolve the Zoo Commission at will. The Zoo Commission must receive the City's approval before altering its own By–Laws or making "major departures" from its budget. If anything, the *Moberly* Board of Governors had greater autonomy than the Zoo Commission.

In this case, although it appears that no audio tapes or paper minutes for the closed meeting will actually be delivered, we shall affirm the circuit court's ruling on the Public Information Act issue. If tapes or minutes are found to exist, the Zoo Commission would have to turn them over to Andy's. Prospectively, the Zoo Commission is obligated to adhere to the Public Information Act. *See S.G.* §§ 10–611 to 628.

## II. The Open Meetings Act

Andy's argues that the Zoo Commission also violated the Open Meetings Act, S.G. §§ 10–501 to 512, by holding its April 16, 1997 meeting in closed "executive session." The Zoo Commission contends, however, that under the provisions of S.G. § 10–502(h), it is not a "public body" subject to the Act. It supports this argument primarily on the basis of its corporate status and the autonomy that it exercises over its own affairs and appointments.

### A. The Act in General

The Open Meetings Act ("the Act") states that "[e]xcept as otherwise expressly provided in this subtitle, a public body shall meet in open session." S.G. § 10–505. State Government § 10–502(h) defines "Public body" as:

(1) ... an entity that: (i) consists of at least 2 individuals; and (ii) is created by:

1. the Maryland Constitution;

2. a State statute;

3. a county charter;

4. an ordinance;

5. a rule, resolution, or bylaw;

6. an executive order of the Governor;

or 7. an executive order of the chief executive authority of a political subdivision of the State.

(2) "Public body" includes any multimember board, commission, or committee appointed by the Governor or the chief executive authority of a political subdivision of the State, if the entity includes in its membership at least 2 individuals not employed by the State or a political subdivision of the State.

The Act reflects the policy that a democratic government should be accessible and visible to the public. Specifically, S.G. § 10–501 states, in pertinent part:

(a) *In general.*—It is essential to the maintenance of a democratic society that, except in special and appropriate circumstances:

(1) public business be performed in an open and public manner; and

(2) citizens be allowed to observe:

(i) the performance of public officials; and

(ii) the deliberations and decisions that the making of public policy involves.

(b) *Accountability; faith; effectiveness.*—

(1) The ability of the public, its representatives, and the media to attend, report on, and broadcast meetings of public bodies and to witness the phases of the deliberation, policy formation, and decision making of public bodies ensures the accountability of government to the citizens of the State.

(2) The conduct of public business in open meetings increases the faith of the public in government and enhances the effectiveness of the public in fulfilling its role in a democratic society.

To achieve these goals, the Act details: the composition, function, powers, and duties of the State Open Meetings Law Compliance Board (the "Compliance Board"), S.G. §§ 10–502.1–6; the process by which people may file complaints with the Compliance Board about public bodies that have failed to comply with the Act, S.G. § 10–502.5; prospective violations of the Act, S.G. § 10–502.6; the scope of the Act, S.G. § 10–503; resolution of conflicts with other laws, S.G. § 10–504; the notice public bodies must provide regarding meetings, S.G. § 10–506; attendance at public meetings, S.G. § 10–507; when closed sessions of public bodies are permitted, S.G. § 10–508; minutes of meetings, S.G. § 10–509; enforcement procedures for the Act, S.G. § 10–510; and the applicable penalty for noncompliance, S.G. § 10–511.

## B. The Zoo Commission's Contentions Regarding the Act

The Zoo Commission contends that, even if it is held to be a "unit or instrumentality" of a subdivision of the State govern-

ment as considered by the Public Information Act, S.G. § 10–611(g)(1)(i), it still does not fall within the Open Meetings Act's definition of "public body," which arguably covers a more narrow range of entities. The Zoo Commission argues that S.G. § 10–502(h)(1), the first Open Meetings Act subsection to define "public body," is inapplicable to it because the Zoo Commission was not created by any of the methods enumerated in that subsection.

To be sure, nothing in the record indicates what caused the City Solicitor to file the Zoo Commission's Articles of Incorporation in 1983. If a City Council resolution or an executive order from the Mayor had been the impetus, it would seem that the Zoo Commission would be a public body as defined by S.G. § 10–502(h)(1). As noted, the Articles of Incorporation grant the Mayor and City Council authority over the Zoo Commission. They also provide that, if the City government or the Zoo Commission's own members dissolve the Zoo Commission, its assets become City property. It is highly unlikely that the City Solicitor, *sua sponte*, would file such Articles without the knowledge and approval of the Mayor and City Council, just as it is unlikely that the Solicitor would list the Mayor's Executive Secretary as Resident Agent and the City's Government Office Building as the Resident Agent's address without direction from and the knowledge or consent of the Mayor and City Council. We need not, however, speculate as to the Solicitor's motivations. Instead, we will move on to consider S.G. § 10–502(h)(2), the subsection that contains the second definition of "public body".

The Zoo Commission argues that S.G. § 10–502(h)(2) is also inapplicable because the Zoo Commission is not a "board, commission, or committee appointed by the Governor or the chief executive authority of a political subdivision of the State...." The Zoo Commission's argument under this subsection is twofold: first, it contends that it is not a "board, commission, or committee" as contemplated by the statute; second, it contends that it is not "appointed" by the Mayor of Salisbury, who is the chief executive officer of the City. We will address the arguments in the reverse order, first consid-

ering the Zoo Commission's membership appointment process and then the "board, commission, or committee" aspect of the "Public body" definition in S.G. § 10–502(h)(2).

### C. The City's Appointment Authority over the Zoo Commission

■ The Zoo Commission's argument regarding the "appointed by" language of S.G. § 10–502(h)(2) misses the mark. The Zoo Commission contends that, because it submits a list of candidates to the Mayor and City Council for appointment to its board, it has sufficient autonomy to avoid being classified as a public body. The Mayor is the chief executive authority for Salisbury. Salisbury Charter § SC3–4.A (1996). Although the Zoo Commission's By–Laws provide that it may submit a list of candidates to the Mayor and City Council "for consideration for appointment," the appointing authority is not bound by the list. The Zoo Commission's Articles clearly state that "[t]he members of the Corporation [the Zoo Commission] shall be appointed by the Mayor and City Council," and its By–Laws state that "The members of the Corporation shall serve at the discretion of the Mayor and City Council. . . . The members of the Corporation shall be appointed by the Mayor and City Council. . . ." This process is similar to the Mayor's shared appointment powers for department heads where the council provides "advice and consent." Salisbury Charter § SC3–4.C. The Mayor, in conjunction with the City Council, has the ability to appoint new members and remove current members, and therefore we conclude that the Zoo Commission satisfies the appointment aspect of S.G. § 10–502(h)(2).

Our conclusion is supported by prior judicial treatment of the issue in other jurisdictions. Open Meetings Laws have been enacted, in some form, in each of the fifty states. *Board of County Commissioners of Carroll County v. Landmark Community Newspapers,* 293 Md. 595, 601, 446 A.2d 63 (1982). North Carolina's Open Meetings Law is somewhat similar to Maryland's, stating in pertinent part that " 'public body' means any elected or appointed authority, board, commission,

committee, council ... of the State, or of ... other political subdivisions or public corporations...." N.C. Gen.Stat. § 143–318.10. In *DTH Publishing Corporation v. University of North Carolina,* 128 N.C.App. 534, 496 S.E.2d 8, *review denied,* 348 N.C. 496, 510 S.E.2d 381, 382 (1998), employees of the plaintiff newspaper sought to attend closed sessions of the Undergraduate Court, a student court that adjudicated allegations of student conduct violations. The Undergraduate Court was appointed by the Student Body President and confirmed by the Student Congress "in accordance with policies adopted by the ... [University Chancellor] pursuant to the authority delegated" by the University's Board of Governors. *DTH Publishing Corporation,* 496 S.E.2d at 10–11. The defendants, the University and the Undergraduate Court itself, argued that they should not be subject to the Open Meetings Law because the selection of Undergraduate Court members was too attenuated to be deemed direct appointments by the University's Board of Governors. *Id.* at 10–11. The Court of Appeals of North Carolina disagreed with this "narrow construction" of the statutory phrase "public body ... elected or appointed," holding that the process of appointment was sufficiently direct for the Undergraduate Court to be a "public body." *Id.*

*DTH Publishing Corporation,* while certainly not directly on point with the present case, is instructive in the interpretation of Open Meeting Acts. By looking to the general method in which the Undergraduate Court was created, and determining that the final effect of the "trickle-down" appointment was sufficiently equivalent to a direct appointment, the court included within the ambit of North Carolina's law an entity that, under a narrow reading of the "appointed" criteria, could have been classified as a non-public body. In the case *sub judice,* the Zoo Commission's members are appointed directly by the Mayor and City Council without intermediary actors.

We must not overlook the purposes of the legislation before us. The legislative policy section of Maryland's Open Meetings Act outlines the goals that the Act seeks to achieve, stating that it is "essential to the maintenance of a democratic

society" to allow public access to the deliberative processes of government. Such access enhances both governmental accountability and the "faith of the public in government." S.G. § 10–501. To these ends, Maryland's Open Meetings Act sets forth the "minimum requirements" for holding open meetings. These minimum requirements can be enhanced by statutory provisions specifying even greater access to public meetings in certain circumstances. *City of College Park v. Cotter*, 309 Md. 573, 586, 525 A.2d 1059 (1987) (citing S.G. § 10–504). In the present case, there is no legislative enactment to enlarge upon the Open Meetings Act, but such an enactment is not necessary.

■ The Court of Appeals, in *State v. Fabritz*, 276 Md. 416, 421, 348 A.2d 275 (1975), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976), stated that "a statute should be construed according to the ordinary and natural import of its language, since it is the language of the statute that constitutes the primary source for determining the legislative intent." *Id.* (citations omitted). For that reason,

> [w]here there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intention of the Legislature. Thus, where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning.

*Id.* at 421–422, 348 A.2d 275 (citations omitted).

Using the natural import of the words of the statute, we apply the Zoo Commission's circumstances to the Act. The Act covers "any multimember board, commission, or committee appointed by . . . the chief executive authority of a political subdivision of the State. . . ." S.G. § 10–502(h)(2). The Zoo Commission's members, as required by its Articles and By-Laws, are appointed by the Mayor and City Council; all that remains is to determine whether it is a "board, commission, or committee" under S.G. § 10–502(h)(2).

### D. The Zoo Commission as a "board, commission, or committee"

In its brief, the Zoo Commission argues that it considers S.G. § 10–502(h)(2)

> to cover boards, commissions, or committees which are established, created, or convened by a chief executive to conduct public business, and that said entities are included as a 'catch all' akin to 'public body' entities created by executive order as provided in § 10–502(h)(1)(ii)7. That term does not cover a *corporation* such as the Zoo Commission which has been established under the general incorporation laws of Maryland [and] which has not been created by any governmental action. [Emphasis in original.]

The Zoo Commission cites as support Opinion No. 96–14 of the Open Meetings Act Compliance Board, the board established by S.G. §§ 10–502.1–6 to receive, review, and comment on complaints from persons alleging violations of the Act by public bodies. The Compliance Board consists of three members, at least one an attorney, appointed by the Governor. S.G. § 10–502.2. After reviewing the complaints of persons alleging violations of the Act, the Compliance Board issues a written opinion discussing whether a violation has occurred. S.G. § 10–502.4. Opinions of the Compliance Board are advisory only, and may not be introduced as evidence in an enforcement proceeding conducted under S.G. § 10–510. S.G. § 10–502.5.

Although it is not precedential or in any way binding upon our decision, we will review the Compliance Board Opinion cited by the Zoo Commission for the limited purpose of its legislative analysis. In Opinion No. 96–14, dated December 19, 1996, the Compliance Board considered the applicability of the Open Meetings Act to the Baltimore Area Convention and Visitors Association, Inc. ("BACVA"). BACVA's Board of Directors had denied a newspaper reporter access to one of its meetings. BACVA originally was created as a private corporation, with management and a Board of Directors that initially were not controlled or appointed by the local or State

government. BACVA subsequently chose to amend its corporate charter to give the Mayor of Baltimore City authority to appoint its board members, but that was the extent of the Mayor's authority.

The Compliance Board considered whether BACVA was a "public body" under S.G. § 10–502(h)(2). In pertinent part, the Compliance Board's opinion states:

> As we read it, the phrase 'multimember board, commission, or committee' refers to entities that are part of government. When the Legislature used the term 'board,' it apparently intended to refer to the kind of governmental entity that is called a 'board,' not the board of directors of a private corporation.

> In part, our conclusion is based on the common usage of the statutory terminology. The primary meaning of the term 'board' ... is '[a]n official or representative body organized to perform a trust or to execute official or representative functions or having the management of a public office or department exercising administrative or governmental functions.' *Black's Law Dictionary* 173 (6th ed. 1990). Moreover, because the terms 'commission' and 'committee' refer to governmental entities, the term 'board' probably refers to another in the same class of entities.

> In part, our conclusion is based on the legislative history of § 10–502(h)(2). When the 1991 reform bill was introduced, it contained the following as the proposed addition to the definition of 'public body':

> ' "Public body" includes the multimember governing body of any corporation directly supported entirely by public funds.' This language was deleted by amendment and the language that now appears in § 10–502(h)(2) was inserted in its stead. Because the deleted language referred to a corporate board of directors as the 'governing body of [a] corporation,' it is unlikely that the Legislature intended to include a private corporation's board of directors within the scope of § 10–502(h)(2) as enacted.... This change of language indicates to us a change in the legislative objective—instead of apply-

ing the Act to publicly funded private corporations, the General Assembly continued to limit the reach of the law to those entities that are themselves governmental or quasi-governmental 'board[s], commission[s], or committee[s].' The purpose of the enacted amendment to § 10–502(h)(2), we believe, was to ensure that the Act would apply to all boards, commissions, and committees that are part of government, even if the Governor or the local executive chose to create a particular board, commission, or committee by informal means, instead of an executive order.

In our opinion, BACVA has not assumed the status of a government board, despite the Mayor's ability to control the membership of the board. Although control is surely an important factor in determining the governmental status of an entity, it is not alone determinative. *See A.S. Abell Publishing Corp. [Co.] v. Mezzanote*, 297 Md. 26, 35, 464 A.2d 1068 (1983). The decision to grant the Mayor appointment power was not the Mayor's. Because BACVA had been in existence long before the change to mayoral appointments of its board members, the decision to make the change was that of BACVA's prior board. [Citations omitted.]

After concluding that BACVA was not a public body and that, therefore, the Open Meetings Act did not apply to BACVA, the Compliance Board stated, "This conclusion reflects our interpretation of the law, not our view of wise policy. To the contrary: Because BACVA, *despite its retaining the form and function of a private corporation,* is in reality an instrumentality of City policy. . . ." (Emphasis added.) The Compliance Board encouraged BACVA to reconsider its policy of holding closed meetings.

In the present case, the trial court heard the parties' arguments regarding the Zoo Commission's closed session and the Open Meetings Act, including the applicability of the Compliance Board's Opinion, and then ruled:

I am satisfied . . . that the Zoo Commission is not a public body subject to the Open Meetings law. They do not have

to comply with the Open Meetings law, and the contract will not be voided because of the Open Meetings law.

Now, the reason ... came out pretty well in my questions to counsel for the plaintiff [Andy's], I believe the prior Opinion by the authorities [apparently the Compliance Board's BACVA Opinion] on this issue, although not binding upon the Court, I think their review of the legislative history was persuasive, and this independent body cooperate [sic] is not a ... 'public body' within the meaning of the Act.

The Compliance Board's analysis, if we were to adopt it in full, may produce a different result in the present case. The Zoo Commission, like BACVA, is "in reality an instrumentality of City policy." The Zoo Commission, however, does not retain the same "form and function" of a private corporation as BACVA. Notwithstanding its corporate form, the Zoo Commission is much less "private" and more functionally dependent upon the City than BACVA.

■ First, BACVA was not created by an agent of the City as was the Zoo Commission. Second, BACVA voluntarily, after thirteen years of existence, granted the Mayor of Baltimore appointment power over its board. The Zoo Commission was created with Articles of Incorporation that, from its inception, gave the Mayor and City Council of Salisbury the power to appoint its members, and that power has never been relinquished. Third, it appears that the only power the Mayor of Baltimore has over BACVA is that of making appointments; he or she has no veto or agenda-setting power. In contrast, the Zoo Commission's By–Laws grant the Mayor and City Council of Salisbury veto power over proposals submitted for approval by the Zoo Commission.[8] Fourth, whereas the Mayor of Baltimore has no involvement with BACVA's budget, the

---

8. The March 1997 memo, quoted above, from John Pick, the City's Executive Officer, reveals that the bidding process that led to this cause of action was "based on the guidance given by the [City] Council...." The City sought bids from concessionaires and cannot now claim that the Zoo Commission was acting independently.

Zoo Commission must submit a budget to the Mayor and City Council of Salisbury, "consistent with the City of Salisbury procedures on budgets," and any major departures from the budget must be approved by the Mayor and City Council. These four factors alone sufficiently differentiate the Zoo Commission from BACVA.[9] The Zoo Commission has the functional status of a government board.

The Compliance Board also considered the significance of a version of S.G. § 10–502(h)(2) that the General Assembly considered but never adopted. The Compliance Board hypothesized that, because the legislature did not insert into the statutory definition of "public body" the clause " 'Public body' includes the multimember governing body of any corporation directly supported entirely by public funds," it is unlikely that the legislators intended to include a private corporation's board of directors. This conjecture is not the only reasonable explanation for the General Assembly's actions. For example, the legislators may have chosen not to focus on funding as the standard for inclusion within the statute, believing that, under a funding standard, certain unintended entities would be caught in the statute's net.

In 1997, a Senate Bill was proposed, and ultimately not adopted, that would have added to the definition of "Public Body" in S.G. § 10–502(h)(1) the phrase "A private entity that, during the fiscal year in which a meeting is held: 1. will receive the proceeds of a state bond; or 2. receives funding in the state budget." Failed Senate Bill 487 (1997). Similarly, in 1998 another Senate Bill was proposed, but not adopted, that would have added to S.G. § 10–502(h) the phrase " 'Public body' includes any Maryland corporation that is governed by a governing body at least 50% of whose members are required by the corporation's articles of incorporation or bylaws to be

9. The Compliance Board suggested that BACVA did not satisfy the common definition of the term "board." We note that a common definition of "commission" is "[a] board or committee officially appointed and empowered to perform certain acts or exercise certain jurisdiction of a public nature or relation...." BLACK'S LAW DICTIONARY 246 (5 th ed. 1979).

appointees of a public officer or employee." Failed Senate Bill 340 (1998).

Although it may be appropriate and useful to review a failed legislative effort in determining legislative intent, whether as part of the original legislative effort or subsequent amendments, legislative rejection is not an infallible indicator of legislative intent. In fact, it has been characterized by the Court of Appeals as "a rather weak reed upon which to lean in ascertaining legislative intent." *Automobile Trade Association v. Insurance Commissioner*, 292 Md. 15, 24, 437 A.2d 199 (1981); *see also State v. Bell*, 351 Md. 709, 721, 720 A.2d 311 (1998). The fact that the Zoo Commission may have met more closely some or all of these proposed definitions of "public body" does not require its exclusion from the version that was adopted. The three rejected definitions and the adopted version, none of which is mutually exclusive of the others, focus on different aspects of an entity's inception, structure, management, and funding.

We believe that S.G. § 10–502(h)(2) was intended to encompass, in the Compliance Board's words, "those entities that are themselves governmental or quasi-governmental 'board[s], commission[s], or committee[s],' . . . [i.e.] all boards, commissions, and committees that are part of government, even if the Governor or the local executive chose to create a particular board, commission, or committee by informal means, instead of an executive order."

This analysis neither excludes nor includes *all* "publicly funded private corporations." To permit the government to operate outside of the view of the public through private corporations, however, is an invitation to great mischief, which the Open Meetings Act seeks to curtail. Therefore, the focus of review is transactional in the sense that the analysis requires a determination of the extent to which the controlled entity actually carries on public business. A private corporate form alone does not insure that the entity functions as a private corporation. When a private corporation is organized under government control and operated to carry on public

business, it is acting, at least, in a quasi-governmental way. When it does, in light of the stated purposes of the statute, it is unreasonable to conclude that such an entity can use the private corporation form as a parasol to avoid the statutorily-imposed sunshine of the Open Meetings Act.

The Zoo Commission's corporate cloak, especially in the letting of the concessionaire's contract and the subletting of public parkland, is illusory. Like the emperor, it has no clothes. Its Articles of Incorporation, which create an ostensible private corporation but effectively place organizational control in the governmental authority of the City, do not create actual autonomy. The Zoo Commission, although incorporated, is structured to assist the City informally in the "operation, management, and promotion" of the Zoo, as clearly stated in the Zoo Commission's By–Laws and Articles of Incorporation. It is essentially a part of government, much like a more traditional parks and recreation board appointed by the council or the mayor of a municipality. In fact, it is listed among the City's boards and commissions as the "Zoo Commission." In at least one appointing resolution, it is referred to as the "Zoo Commission" without a private corporation designation, and one council member did not vote on the appointments because she believed the public should have more opportunity to participate in "commission" appointments.

### E. Private, public, and quasi-public corporations

The Zoo Commission argues that, as a private corporation in form, it should not be classified as a public body. Its functional structure, however, is more in character with a public or quasi-public corporation.

The essential difference between a public and a private corporation has long been recognized at common law. A public corporation is an instrumentality of the state, founded and owned by the state in the public interest, supported by public funds, and governed by managers deriving their authority from the state. Public institutions, such as state, county and city hospitals and asylums, are owned by the public and are devoted chiefly to public purposes. On the

other hand, a corporation organized by permission of the Legislature, supported largely by voluntary contributions, and managed by officers and directors who are not representatives· of the state or any political subdivision, is a private corporation, although engaged in charitable work or performing duties similar to those of public corporations. *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L.Ed. 629, 667; *Regents of University of Maryland v. Williams,* 9 Gill & J. 365, 388, 31 Am. Dec. 72; *Hughes v. Good Samaritan Hospital,* 289 Ky. 123, 158 S.W.2d 159. So, a hospital, although operated solely for the benefit of the public and not for profit, is nevertheless a private institution if founded and maintained by a private corporation *with authority to elect its own officers and directors. Washingtonian Home of Chicago v. City of Chicago,* 157 Ill. 414, 41 N.E. 893.

*Levin v. Sinai Hospital of Baltimore,* 186 Md. 174, 178, 46 A.2d 298 (1946) (emphasis added).

Quasi-public corporations occupy the middle ground between public and private corporations, generally having the functions of the former and the structure of the latter. The Court of Appeals, in *Potter v. Bethesda Fire Department, Inc.,* 309 Md. 347, 354, 524 A.2d 61 (1987), explained that

a 'quasi-public corporation' is not *per se* public or governmental. On its face, the term connotes that it is not a public corporation but a private one. But 'quasi' indicates that the private corporation has 'some resemblance (as in function, effect or status)' to a public corporation.... '[Q]uasi' bespeaks 'that one subject resembles another ... in certain characteristics, but that there are intrinsic and material differences between them.' [Omitting citations to dictionaries].

■■■ The Zoo Commission does not have some of the characteristics that are often present in quasi-public corporations, but the latter, as suggested by their hybrid identities,

are varied in nature, form, and function.[10] For instance, quasi-public corporations are usually wholly private companies acting for public benefit. "A quasi-public corporation is, by its very words, not a public corporation, and thus is a private corporation. But the word 'quasi' . . . denotes that it has the characteristic of a public corporation in function, effect or status." *Potter*, 309 Md. at 357, 524 A.2d 61 (citing 1 W. Fletcher & C. Swearingen, *Cyclopedia of the Law of Private Corporations* § 63 at 600 (1983 Rev.Vol.)). If anything, the Zoo Commission is more public than private, its only significant private attribute being its incorporation under the general corporate laws.

We need not determine that the Zoo Commission precisely matches the definition of a quasi-public or a public corporation. Certainly its actions, ownership, appointments, and managing structure are sufficiently governmental for it to fail to qualify as a strictly private corporation. Only the Zoo Commission's incorporation under the general corporation laws weighs against its designation as a traditional public entity. All of its other attributes suggest that it is, indeed, a public body under the Open Meetings Act. Its very purpose and the degree of control that the Mayor and City Council have over the Zoo Commission indicate that the latter was organized and has functioned as an extension or sub-agency of the City government.

We consider again the public attributes of the Zoo Commission. Its purpose, stated in its By–Laws and Articles of Incorporation, is to "assist the City . . . in the operation, management and promotion" of the Zoo. Its non-private attributes, as granted in its By–Laws and discussed above, include the following: the Mayor and City Council of Salisbury have veto power over the Zoo Commission; the Zoo Commission must present its annual budgets to the Mayor and City

---

10. The *Potter* Court also noted the paucity of case law or statutory indications in Maryland concerning the exact definition of quasi-public corporations, and stated that there is no definitive identity for this type of entity. *Id.*, 309 Md. at 357, 524 A.2d 61.

Council, and any "major departures from that budget" must be approved by the Mayor and City Council; the Zoo Commission undergoes an annual audit by an auditor selected and paid by the City; the Mayor and City Council can change the By–Laws on their own initiative and can reject any changes suggested by the Zoo Commission members; the members of the Zoo Commission are appointed by and serve at the discretion of the Mayor and City Council; the Mayor and City Council can dissolve the Zoo Commission, and if they do the Zoo Commission's assets revert to the City.

### F. The Remedy for a Violation of the Open Meetings Act

On June 27, 1997, Andy's filed the present suit alleging that the Zoo Commission had violated the Open Meetings Act by choosing Flannery's bid in a closed meeting. At the Zoo Commission's meeting on August 20, 1997, the Zoo Commission board members mentioned Andy's suit and, in public session, voted to "reaffirm, ratify and, again, award the bid to Flannery's," according to the Zoo Commission's meeting minutes.

While the Open Meetings Act does not provide the public with the right to participate in all open meetings of public bodies, it does guarantee the right "to observe the deliberative process and the making of decisions by the public body" at those open meetings. *City of New Carrollton v. Rogers*, 287 Md. 56, 72, 410 A.2d 1070 (1980). This right applies to all deliberations preceding the actual act that ratifies or effectuates the public body's intent. *Id.* at 72, 410 A.2d 1070. "It is, therefore, the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business." *Id.* at 72, 410 A.2d 1070.

In *City of New Carrollton*, 287 Md. at 72–73, 410 A.2d 1070, the Court of Appeals cited *Town of Palm Beach v. Gradison*, 296 So.2d 473 (Fla.1974), in which the Supreme Court of

Florida reviewed that state's open meeting ("sunshine") law and stated:

> One purpose of the government in the sunshine law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken.

If the Zoo Commission acted improperly by meeting in closed session, it cannot simply re-vote to legalize the illegal decision. This would, as the Court of Appeals noted in *City of New Carrollton*, eviscerate the goals of the Open Meetings Act. In the future, the Zoo Commission must generate the meeting minutes required by S.G. § 10–509(b). In certain circumstances, it may meet in closed session, S.G. § 10–508, but in those instances it must comply with the requirements of S.G. § 10–509(c) regarding minutes and recordings of closed meetings.

The circuit court, because it found that the Open Meetings Act did not apply to the Zoo Commission, did not reach the issue of appropriate relief. In light of our determination that the Open Meetings Act applies to the Zoo Commission, we shall remand this case to the circuit court for further proceedings in accordance with this decision. Such proceedings will require consideration of the provisions of S.G. § 10–510(d), but in light of our decision on the issue of delegation, discussed later in this opinion, there will be no need to declare the final action of the commission void pursuant to the provisions of § 10–510(d)(4).

### III. The City's Delegation to the Zoo Commission

Andy's contends that the City's Mayor and City Council could not delegate to the Zoo Commission the authority to evaluate bids and select a concessionaire for the City Park. Andy's also argues that the Zoo Commission's lease from the City, and subsequent contract with Flannery's, was an improper franchise under the City's Charter and Code.[11] The Zoo Commission, according to Andy's, lacks the legal authority to bind the City to a contract concerning the City Park. The City, in turn, argues that it has not surrendered its police power by permitting the Zoo Commission to choose a concessionaire.

We believe, however, that focusing solely on police powers is not appropriate. *See Pressman v. Barnes*, 209 Md. 544, 552, 121 A.2d 816 (1956). The more relevant consideration is whether the City has improperly delegated to the Zoo Commission a discretionary power and responsibility of the City.

 "Municipal corporations have only the powers conferred upon them by the Legislature, and these are to be strictly construed. 'To doubt such power in a given case is to deny its existence.'" *Duvall v. Lacy*, 195 Md. 138, 143, 73

---

11. The City Charter provides:
 The City ... shall have the power ... To grant franchises to electric, gas, telephone, telegraph, street railway, taxicab, bus, water, heating, sewer or drain companies and to any others which may be deemed advantageous and beneficial to the city, and the city, notwithstanding anything that may be set out in any such franchise, shall not have the power to divest itself of its police power to regulate and control the use of the streets, alleys, highways and other public places of the city under any franchise that may be so granted by it....
 Salisbury Charter § SC5–1.A.(14).
 Md.Code (1957, 1998 Repl.Vol.), Article 23A, § 2A(d)(2) provides:
 Each municipal corporation shall have the authority to displace or limit competition by granting one or more franchises for any concession on, over or under property owned or leased by the municipality on an exclusive or nonexclusive basis, to control prices and rates for such franchises; to establish rules and regulations to govern the operation of the franchises, to provide for the enforcement of any such measure; and to lease or sublease publicly owned or leased land, improvements to land, or both on terms to be determined by the municipality without regard to any anticompetitive effect.

A.2d 26 (1950) (quoting *Hanlon v. Levin,* 168 Md. 674, 677, 179 A. 286 (1935)).

> The City has no right under the law to delegate its governing power to any agency. The power of the City is prescribed in its charter, and the City Charter constitutes the measure of power that is possessed by any of its officials. To delegate such power to an independent agency would be a serious violation of the law. To recognize such delegation of power in any City department might lead to the delegation of such power in all departments, and would result in the City government being administered regardless of its charter.

*Mugford v. City of Baltimore,* 185 Md. 266, 271, 44 A.2d 745 (1945). As stated by the Court of Appeals, "The rule is plain and well established that legislative or discretionary powers or trust devolved by law or charter in a council or governing body cannot be delegated to others, but ministerial or administrative function may be delegated to subordinate officials." *City of Baltimore v. Wollman,* 123 Md. 310, 315, 91 A. 339 (1914). In the absence of express authorization to delegate a discretionary power, all such powers must be exercised by the council even though a ministerial or administrative function related to implementing a discretionary decision may be delegated to an agent. *Wollman,* 123 Md. at 316, 91 A. 339.

When the delegated activities have exceeded mere ministerial tasks, however, the delegation is unlawful. *Hughes v. Schaefer,* 294 Md. 653, 660–662, 452 A.2d 428 (1982) (City could not delegate to administrative "Trustees" the authority to select primary candidates for City loan proposals, from which City's Board of Estimates chose successful candidates; this illegal "prior veto" prevented the "continuing exercise by the Board of its ultimate judgment and discretion"); *Renshaw v. Grace,* 155 Md. 294, 142 A. 99 (1928) (commission established by General Assembly to assist Mayor and City Council of Easton usurped the discretionary functions of Easton government when it acted without the approval of the Mayor and City Council).

■ Any municipal delegation of ministerial authority must contain sufficient guidelines to ensure that the officers carrying out the delegations will act in accordance with the legislative will, and not employ their own unbounded discretion. *Hitchcock v. Galveston,* 96 U.S. 341, 6 Otto 341, 24 L.Ed. 659 (1877) (city council could delegate authority to chairman of "committee on streets and alleys" to contract for the construction of sidewalks, where the council specified materials to be used and preparatory work to be done); *Northern Central Railway Co. v. Mayor and City Council of Baltimore,* 21 Md. 93 (1864) ("eminently proper" for Mayor and City Council to delegate, by detailed and restrictive ordinances, administration of railroad construction in city).

■ As noted in 2A McQuillin, *The Law of Municipal Corporations* (3rd Ed.), § 10.38:

When a city acting within its charter powers grants franchises for the use of its ... parks and other places for public purposes, the right of control and regulation on the part of the municipal authorities must be reserved so that it may be exercised at any time for the public good.

A judicial examination of a specific grant of power necessarily considers the powers reserved to the municipality and the limits of the authority delegated. For example, in *Warren v. Topeka,* 125 Kan. 524, 265 P. 78 (1928), a park vending agreement was held to be legal because the vending company had a concession, not a lease:

[T]he city reserv[ed] to itself and the commissioner of parks and public property full and complete control and supervision over the entire park and the property therein and the right to impose from time to time rules and regulations as to the operation of the concessions.... 'The concessions granted do not amount to the leasing of any part of the park ... nor do they involve the loss of control over it by the public officers.'

*Id.,* 265 P. at 80 (citation omitted). *See Charlton v. Champaign Park District,* 110 Ill.App.3d 554, 557–560, 442 N.E.2d 915, 66 Ill.Dec. 354 (1982) (no illegal delegation when park

district's contract with waterslide operator left park district sufficient control to protect public use of the waterslide and rest of park; reservation of power made contract a license rather than a lease); *Boseley v. Park District of Oak Park,* 275 Ill. 92, 96, 113 N.E. 984 (1916) (contract to build library in park, with park district and library authority each occupying and managing portion of the building, invalid because library authority would have had "exclusive right to use, occupy and control [most] of the building," in conflict with park district's grant of power over property).

In *Hanlon,* 168 Md. at 681, 179 A. 286, the Court of Appeals held invalid a rental agreement between Baltimore City's park board and a radio corporation, which would have allowed the latter to erect a broadcasting tower in Druid Hill Park. The park board, and the city itself, did not have authority to rent a portion of a public park to a private enterprise that would have prevented public use of that particular area. The Court held that "[t]he power of management and control of the parks of Baltimore City conferred upon the members of the park board [by City Charter and state law] is far less comprehensive than the right of conveying such property by lease or otherwise."

In the present case, the record indicates that the City Council, at its April 28, 1997 meeting, unanimously approved a Resolution that detailed a proposed lease between the City and the Zoo Commission, and authorized the Mayor to execute the lease on behalf of the City. The Council's minutes contain the salient details of the lease, but do not mention any debate or comments from Council members. The minutes indicate that, immediately after the Resolution was approved, the Zoo Commission's Chairman informed the Council that the Zoo Commission had already chosen Flannery's bid, and mentioned the specific factors that had led to that selection. The minutes contain no indication of any comment or express approval from the Council concerning Flannery's selection. On the other hand, there was no veto by the Council as provided for in the Zoo Commission's By-laws.

One week later the Mayor executed a lease with the Zoo Commission. The lease agreement itself is relatively standard and reflects, in form, an arm's length transaction between two separate and independent entities. In pertinent part, the lease states that

> the leased premises shall not be used for any purpose other than a concession stand and uses related thereto. City consents to Tenant [Zoo Commission] subleasing the leased premises to a concession stand operator upon terms and conditions acceptable to City which shall include, but not be limited to, installation of a mobile concession stand ... [and trash removal provisions].

The lease specifies that it is not an exclusive lease and that the leased area may be used by the general public. It also states that the Zoo Commission will be in default under the lease if, among other events, it uses or permits the use of the premises for any purposes other than those specified in the lease, or if it "shall assign this lease or any portion thereof without written consent of the City, *except sublease to a concession stand operator as provided for herein.*" (Emphasis added.)

Although the Zoo Commission did not have authority to change the ultimate use of the leased property, it had authority under the lease to select the concessionaire and decide, to some degree, how the concession operation was configured. The City cites 10 McQuillin 3rd Ed., *The Law of Municipal Corporations,* § 28.53, for the proposition that

> "[t]he park authorities ordinarily are empowered to permit, by lease, license, or similar arrangement, the establishment within the confines of a park of places for furnishing food and beverages, or other refreshments, and to grant privileges and concessions for conducting within the park those transactions which are customarily associated with public use and enjoyment of parks and park properties...." [Citations omitted.].

The City's ability to arrange for concessions in the City Park, however, is not in dispute. The City is the park

authority in this case. The Salisbury Charter grants to the City the power "[t]o establish and maintain public parks and playgrounds" and the power "[t]o control and protect the public grounds and property of the city...." Salisbury Charter § SC5–1.A(26), (27). In addition, Maryland Code Ann., Art. 23A, § 2A(d)(2), provides:

Each municipal corporation shall have the authority to displace or limit competition by granting one or more franchises for any concession on, over or under property owned or leased by the municipality on an exclusive or nonexclusive basis, to control prices and rates for such franchises; to establish rules and regulations to govern the operation of the franchises ... and to lease or sublease publicly owned or leased land ... on terms to be determined by the municipality.

 If the Mayor and City Council had reviewed bids and selected Flannery's, even if the Zoo Commission had reviewed the bids in an advisory capacity, we would have no disagreement with the process. Quite possibly, but we need not decide, the Zoo Commission could oversee the administration of the Flannery's agreement. The City, however, did not select Flannery's. The concession agreement is not between the City and Flannery's but is an agreement between the Zoo Commission and Flannery's. The authority that the City purports to delegate was not strictly ministerial or administrative authority but discretionary authority specifically vested in the City itself. The City delegated that authority and responsibility to a corporation, which it now insists is not an instrumentality of the City government. Although we have found that the Zoo Commission is a public instrumentality subject to the Public Information Act, and is a public body subject to the Open Meetings Act, it does not necessarily follow that it has the authority to make discretionary decisions for the City.

We cannot help but observe that the City and the Zoo Commission want to have their cake and eat it too. They argue that the Zoo Commission is separate and independent from the City on issues of public access to government docu-

ments and meetings. On the other hand, on the issue of delegation they contend that the City never surrendered its discretionary, governmental functions in the sublease of City-owned property to a private vendor. The difficulty in maintaining both arguments illustrates the potential problems and ambiguities created when government seeks to carry on governmental functions, especially non-delegable functions, through ostensibly private entities. We acknowledge that there is no readily apparent bright-line rule to evaluate easily the status and appropriateness of the various permutations of public, private, and quasi-public entities that may be created through the ingenuity of public officials. Without question, such entities can provide useful and appropriate service to the public. We also acknowledge that this is a close call and that the sheerness of the veil between the City and Zoo Commission that hurts the City's position on the "unit or instrumentality" and "public body" issues may enhance its position on delegation. There is, however, a substantial difference between the advisory role of a parks or zoo commission in evaluating concession proposals and the needs of a particular facility, vis-a-vis the public that it serves, and actually awarding concessions and subleasing public parkland. Under the facts of this case, we conclude that the latter is not a delegable function, and the role of the Zoo Commission was not merely ministerial or administrative.

## IV. Attorney's Fees

Andy's, the Zoo Commission, and the City each contend that the trial court erred by not awarding them attorneys' fees. The Open Meetings Act provides that a court *may* "assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred...." S.G. § 10–510(d)(5)(i). The Public Information Act states, "If the court determines that the complainant has substantially prevailed, the court *may* assess against a defendant governmental unit reasonable counsel fees and other litigation costs that the complainant reasonably incurred." S.G. § 10–623(f) (emphasis added).

██ We hold that the trial court did not abuse its discretion by not awarding attorneys' fees. In the trial court, each party prevailed on a portion of the litigation. Obviously, the arguments presented were meritorious and not easily resolved. In light of our decision regarding the Open Meetings Act, however, when the circuit court receives this case on remand, it would be appropriate to re-consider the issue of attorneys' fees as to that issue.

 Assessments of attorneys' fees under the Open Meetings Act do not depend on a finding that the violation of the Act was willful. *Wesley Chapel Bluemount Ass'n v. Baltimore County*, 347 Md. 125, 149, 699 A.2d 434 (1997). Such assessments, however, are not automatic upon a finding that a violation occurred. *Id.*, at 149–150, 699 A.2d 434.

> Courts considering [Open Meetings Act] fee assessments need to take into account, among other things, whether, how, and when the issue of a closed session or other prospective violation was presented to the public body, the basis, if any, the public body gave for concluding that its action was permissible under the Act, whether that basis was a reasonable one under the law and the circumstances, whether the amounts claimed are reasonable, and the extent to which all parties acted in good faith.

*Id.*, 347 Md. at 150, 699 A.2d 434.

Upon remand, the circuit court should consider these factors in deciding on an assessment of counsel fees and litigation costs.

**DECISION OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS DECISION.**

**COSTS TO BE PAID ½ BY ZOO COMMISSION AND ½ BY THE CITY OF SALISBURY.**