832 A.2d 804

## COMMUNITY AND LABOR UNITED FOR BALTIMORE CHARTER COMMITTEE (CLUB) et al.

v.

## BALTIMORE CITY BOARD OF ELECTIONS, et al.

**No. 67, Sept. Term, 2002.**

Court of Appeals of Maryland.

Sept. 15, 2003.

Francis J. Collins (Kahn, Smith & Collins), Baltimore, for appellants.

Michael G. Raimondi, Chief Solicitor (Thurman W. Zollicofer, Jr., City Solicitor of Baltimore), Michael D. Berman, Deputy Chief of Litigation (J. Joseph Curran, Jr., Atty. Gen.), for appellees.

Argued before ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

ELDRIDGE, J.

The issue in this case is whether the Baltimore City Council and its Judiciary and Policy Committee violated the Open Meetings Act, Maryland Code (1984, 1999 Repl.Vol., 2002 Supp.), §§ 10–502 *et seq.* of the State Government Article,

when it considered Bill 02–0654.[1] This Bill, later designated as Question Q, proposed an amendment to the Baltimore City Charter restructuring the Baltimore City Council. It was different from another proposed charter amendment designated as Question P, that was to be placed on the ballot for the election scheduled for November 5, 2002.

The sponsors of Question P, the Association of Community Organizations for Reform Now ("ACORN"), along with three individual voters, the Community and Labor United for Baltimore Charter Committee ("CLUB"), and certain other civic groups (collectively referred to as "CLUB"), filed a complaint and a motion for a preliminary injunction against the Mayor and City Council of Baltimore, the State Board of Elections, and the Baltimore City Board of Elections, seeking to remove Question Q from the ballot. In the complaint, as amended, CLUB alleged that the City Council's meeting of August 8 violated various provisions of the Open Meetings Act. Therefore, CLUB asserted, the actions of the City Council following from that meeting, including the passage of the Bill designated as Question Q, were void.

After an evidentiary hearing and oral arguments, the Circuit Court for Baltimore City denied CLUB's request for a preliminary injunction on September 26, 2002. CLUB immediately noted an appeal, and this Court issued a writ of certiorari on the same day. After oral argument on September 30, 2002, we issued an order reversing the Circuit Court's judgment and ordering the removal of Question Q from the ballot. We shall now state our reasons for that order.

I.

A.

The Baltimore City Council is a legislative body required to conduct its business in accordance with the requirements of the Open Meetings Act. §§ 10–501, 10–502. In addition, the

---

**1.** All future references to statutes are to the State Government Article, unless otherwise specified.

Standing Committees of the City Council are also subject to the Open Meetings Act. The legislative purpose and policy of the Open Meetings Act is clearly stated in § 10–501, that (emphasis added)

"[i]t is essential to the maintenance of a democratic society that, except in special and appropriate circumstances:

(1) public business be performed in an open and public manner; and

(2) citizens be allowed to observe:

(i) the performance of public officials; and

(ii) the *deliberations* and decisions that the making of public policy involves."

A public body, as defined in § 10–502, must meet in open session, which the general public is entitled to attend, except as otherwise provided for in the Open Meetings Act. §§ 10–505, 10–507, 10–508.[2] The Open Meetings Act further specifies that the public body must provide adequate notice of the meeting. § 10–506.[3] Acceptable methods for providing notice include "publication in the Maryland Register; ... delivery to representatives of the news media [or] ... posting ... the notice at a convenient public location." § 10–506(c). A public body is required to prepare written minutes of its meetings. § 10–509. These minutes are required to include the following information, § 10–509(c)(1):

"(i) each item that the public body considered;

(ii) the action that the public body took on each item; and

---

**2.** Section 10–508(a) lists the topics that may be the subject of closed sessions. Furthermore, "[a] public body that meets in closed session ... may not discuss or act on any matter not permitted under subsection (a) of this section." § 10–508(b).

**3.** § **10–506. Notice of open session.**
"(a) *Required.*—Before meeting in a closed or open session, a public body shall give reasonable advance notice of the session.
"(b) *Form.*—Whenever reasonable, a notice under this section shall:
(1) be in writing;
(2) include the date, time, and place of the session; and
(3) if appropriate, include a statement that a part or all of a meeting may be conducted in closed session."

(iii) each vote that was recorded."

If the public body meets in closed session, the presiding officer must conduct a recorded vote on closing the meeting and make a written statement of the reason for closing the meeting. § 10–508(d)(2). In addition, § 10–509(c)(2) states, in pertinent part, that

"[i]f a public body meets in closed session, the minutes for its next open session shall include:

(i) a statement of the time, place, and purpose of the closed session;

(ii) a record of the vote of each member as to closing the session;

(iii) a citation of the authority under this subtitle for closing the session; and

(iv) a listing of the topics of discussion, persons present, and each action taken during the session."

The Open Meetings Act provides for sanctions in cases of non-compliance. In particular, it provides that if a court "finds that a public body willfully failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of [the Open Meetings Act] and that no other remedy is adequate, [the court may] declare void the final action of the public body." § 10–510(d)(4).

## B.

The genesis of the case at bar lies in two alternative proposals to change the structure of the Baltimore City Council.[4] Prior to the new proposals, the Baltimore City Council was comprised of eighteen council members, in six three-member districts, and a council president elected at large. CLUB supported what became known as Question P, which

---

4. There were several proposals for restructuring the City Council pending in the Council's Judiciary and Policy Committee. For clarity, we focus our discussion on the one proposal that passed the Council and was signed by the Mayor, namely Bill 02–0654, later known as Question Q.

would restructure the City Council such that it would have fourteen single member districts and a president elected at large. Bill 02–0654, which later became known as Question Q, if passed at the November 2002 election, would have restructured the City Council into seven two-member districts and a president elected at large. If, however, both questions were placed on the ballot, and both passed, the Baltimore City Solicitor advised that they would nullify each other as being mutually irreconcilable, and that the structure of the Baltimore City Council would remain unchanged.

ACORN, one of the petitioners here, had obtained over 10,000 signatures of registered voters in Baltimore City to have Question P placed on the ballot in the November 2002 election. This process was completed approximately one week before the August 8 meeting of the City Council. At the time of this meeting, Bill 02–0654 had been in the Judiciary and Policy Committee of the City Council since April, 2002, and had not come out of the Committee. The purpose of calling a meeting of the City Council on August 8 was to discuss, among other business, Bill 02–0654, and "to assess the votes still needed to get the bill out of Committee and to ultimately pass the bill in the Council." The bill was one of the matters discussed at the meeting. The City Council met again on August 12, 2002, when the bill was moved from committee and passed by the Council. The Mayor signed the Bill on August 16, 2002.

Even though the President of the City Council, Sheila Dixon, generally gave public notice of the regularly scheduled Monday, and occasionally, Thursday night meetings of the Council, no notice of the August 8 meeting was given by the President to anyone other than council members. Following instructions, Dixon's assistant made telephone calls to inform the other eighteen members of the City Council of a meeting on Thursday, August 8. The calls were made between August 2 and August 7. Dixon had indicated that she did not want the media to be present at the August 8 meeting "because of her fear of how the media might portray the Council when it was having heated discussions." Nonetheless, Councilman Harris

informed a member of ACORN and a reporter employed by the Baltimore *Sun* of the scheduled meeting. *The Sun* published a report about the scheduled August 8 meeting on August 7.

Six council members, including four of the seven who made up the Judiciary and Policy Committee, were expected to be present. Thus, a quorum of the Judiciary and Policy Committee was anticipated to be present at the August 8 meeting. The trial court also found that

"20. The stated intention of councilmembers to be present at, or absent from, a meeting is not an accurate indicator of who will actually be present. Frequently, not all the members who indicate they will be present actually attend, but sometimes more members are present at the meeting than indicated an intention to be present.

\*　　\*　　\*

"22. A quorum of the City Council is ten.

"23. Physically present in the President's Conference Room at the time of the meeting on August 8, 2002, for some period of time were Council President Dixon, and the following Council members: Welch, Harris, Pugh, Garey, Spector, Curran, Carter, Cain and Reisinger.

"24. The August 8, 2002 meeting was held in the City Council President's Conference Room in City Hall.

"25. At the August 8, 2002, meeting the number of councilmembers present was not constant. [The President's assistant] was instructed by the President to keep track of councilmembers present in the meeting. \* \* \*

"26. At the August 8, 2002, meeting the City Council President's Press Secretary ... was instructed to open the meeting to the public if ten or more councilmembers were present in the room at one time."

One of the appellants, Sultan Shakir, and two reporters were outside the meeting room, and were in contact with the President's assistant and press secretary as they attempted to gain admission to the meeting. The trial court found that "[t]here came a point in time during the course of the meeting when [the press secretary] informed Mr. Shakir and the two reporters that ten councilmembers were present and they could enter the meeting room." Approximately one minute after Shakir and two reporters entered the meeting room, the President determined that ten members of the Council were not present and closed the meeting. The Council did not vote to close the meeting.

The Council met again on Monday, August 12, 2002. The City Council has luncheon meetings every other week. The trial court found that

"45. No individualized notice of these meetings is published, but the City Council President prepares a memorandum to the other members with a calendar of the dates of the regularly scheduled Monday evening sessions. Luncheon meetings are noted on this memorandum with an asterisk next to the date for the regularly scheduled Monday evening session.... This calendar is prepared on a yearly basis and sent to the press. It is also posted on the website. No notice is given of the topics to be discussed at these meetings.

"46. Members of the media regularly attend the luncheon meetings.

"47. No record is kept of who attends these luncheon meetings.

"48. No minutes are kept of who attends these luncheon meetings.

"49. A quorum of the council is sometimes present at the luncheon meetings....

\*　　　\*　　　\*

"51. Sometimes, but not often, bills are brought to the luncheon by members and other members sign them

as a part of the process to bring the bills out of committee and before the entire Council for a vote.

"52. The restructuring bills were not discussed at the August 12, 2002 luncheon meeting."

The City Council met again at 5 p.m. on August 12, for a regularly scheduled meeting. In the time after the luncheon meeting and before 5 p.m., the chairperson of the Judiciary and Policy Committee had obtained sufficient signatures to bring the bill on Question Q out of committee and up for a vote under the rules of the Council.

The trial court made the following findings of fact with respect to the Council President's knowledge:

"57. The City Council President knew since approximately the end of June, 2002, that the City Solicitor had opined that if both Questions P and Q passed at the November, 2002 election, that the two would nullify each other and neither would become law.

"58. Question P, and the fact that ACORN had gathered sufficient signatures to have it placed on the ballot, was discussed at the August 8, 2002 meeting prior to the time that Mr. Shakir and the two reporters entered the meeting room.

\* \* \*

"60. The City Council President's understanding of the Open Meetings Act is that 1) it requires prior public notice be given of the Council's business meetings where a quorum is expected to be present; 2) no prior notice is necessary unless the Council knows that a quorum will be in attendance; and 3) if a quorum appears unexpectedly, opening of the meeting to the public, without notice, is compliance."

The plaintiffs assert that the Baltimore City Council violated the Open Meetings Act at the August 8 meeting, pointing to the lack of notice and closing the meeting without a vote. The defendants counter that there was no quorum expected at

the August 8 meeting and that, therefore, the Open Meetings Act did not apply. The defendants are incorrect.

## II.

We begin our analysis of the Council's actions by considering the purpose of the Open Meetings Act. The first Maryland comprehensive legislation about open meetings came into effect in 1977, with the enactment of the new sections 7 through 15 of Article 76A of the Maryland Code. *See Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 137–138, 699 A.2d 434, 440 (1997). The current Open Meetings Act was the result of a recodification of the provisions of Article 76A by Ch. 284 of the Acts of 1984, without substantial change. Thus, the policy of the Open Meetings Act has remained unchanged, that "citizens be allowed to observe . . . the deliberations and decisions that the making of public policy involves." § 10–501(a).

Chief Judge Murphy, writing for the Court in *New Carrollton v. Rogers,* 287 Md. 56, 72, 410 A.2d 1070, 1078–1079 (1980), stated:

"While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well to all deliberations which precede the actual legislative act or decision, unless authorized by [§ 10–508] to be closed to the public. * * * It is . . . the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business."

*See also Wesley Chapel Bluemount Ass'n v. Baltimore County, supra,* 347 Md. at 138–139, 699 A.2d at 440–441; *College Park v. Cotter,* 309 Md. 573, 585, 525 A.2d 1059, 1064–1065

(1987); *Carroll County v. Landmark Community Newspapers,* 293 Md. 595, 601, 446 A.2d 63, 66 (1982); *Avara v. Baltimore News American Div.,* 292 Md. 543, 548–549, 440 A.2d 368, 371 (1982); *Andy's Ice Cream, Inc. v. Salisbury,* 125 Md.App. 125, 143–144, 724 A.2d 717, 725–726, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999).

■ The clear policy of the Open Meetings Act is to allow the general public to view the entire deliberative process. According to the findings of fact by the trial court, the City Council wished to debate the issue of restructuring at the August 8 meeting. At that time, the council members were aware that Question P, instituting fourteen single member districts, would be on the ballot for the November, 2002, election. It is undisputed that the Council intended to discuss Bill 02–0654, an alternative proposal for restructuring the city council, at the August 8 meeting. The Council President's belief that this discussion would be "heated," is obviously not sufficient reason to close the meeting to the media and the general public. Such discussion is part of the "deliberations" that the "citizens must be allowed to observe," as intended by the Open Meetings Act.

Observation by citizens is possible only when they have notice that such deliberations are planned by their elected representatives. Therefore, the Council was obligated to provide "adequate notice of the time and location of [the] meeting[ ]" to the public. § 10–501(c). We considered the issue of adequacy of notice in *New Carrollton v. Rogers, supra,* where the municipality published a notice listing the time and place of the meeting in two newspapers, and posted the notice with the same information on a bulletin board at City Hall. 287 Md. at 69, 410 A.2d at 1077. We held that this was sufficient to meet the municipality's obligation to give reasonable advance notice in writing as required by the statute then in force.

■ In the instant case, the City Council failed to provide notice to the public in any form. In fact, the Council President deliberately omitted to give notice to the media, contrary to the customary practice of the City Council. The President

of the Council stated that she did not anticipate a quorum, and that, therefore, she believed that the meeting was not covered by the Open Meetings Act. But, as the trial court found, "[t]he stated intention of councilmembers to be present at, or absent from, a meeting is not an accurate indicator of who will actually be present. Frequently, not all the members who indicate they will be present actually attend, but sometimes more members are present at the meeting than indicated an intention to be present." Thus, the President could not reasonably presume that there would be no quorum present. She, therefore, had an obligation to provide reasonable written notice in advance of the meeting. Her failure to do so was a violation of the Open Meetings Act. While it is true that Shakir and members of the media learned about the meeting, their knowledge does not diminish the gravity of the violation. Learning about a meeting, particularly one where the topic was as important as the restructuring of the City Council, by happenstance is contrary to the express policy and purpose of the Open Meetings Act.

 Moreover, once a quorum had been established, and the meeting had been declared open, it should not have been closed without a vote. § 10–508(d)(2).[5] This vote is a simple majority of the members present. There is no record that any such vote was taken at the August 8 meeting. Instead, the presiding officer simply decided to close the meeting, and forced the citizens and members of the media to leave the meeting room. This too was a violation of the Open Meetings Act.

---

5. " § 10–508. **Closed session permitted.**
* * *
"(d) *Vote; written statement.—*
* * *
"(2) Before a public body meets in closed session, the presiding officer shall:
 (i) conduct a recorded vote on the closing of the session; and
 (ii) make a written statement of the reason for closing the meeting, including a citation of the authority under this section, and a listing of the topics to be discussed."

■ The Council also conducted a luncheon meeting on August 12, 2002. As was the general practice, there was no individualized notice of this meeting, no record of attendance was taken, and no minutes of the meeting were kept. We accept the finding of fact of the trial judge that Bill 02–0654 was not discussed at this meeting. We also accept the finding that Shakir would have attended the meeting if he had been aware that the meeting was open to the public. We reiterate that the Open Meetings Act places an affirmative duty on the public body to provide notice of meetings. The City Council failed to provide adequate notice of this meeting, and thus violated the Open Meetings Act.

■ Sometime between the luncheon meeting and 5 p.m. on August 12, 2002, the chair of the Judiciary and Policy Committee obtained enough signatures to put Bill 02–0654 to a vote. Bill 02–0654 did indeed pass at the August 12 evening meeting, and was signed on August 16 by the Mayor, allowing for the inclusion of Question Q on the ballot for the November, 2002, election.

The record does not provide any significant information about the deliberations that preceded the passage of this bill. On the contrary, the record shows that the City Council wished to conduct these deliberations away from the scrutiny of citizens and the media. In pursuit of this goal, the council first omitted to provide notice of the August 8 meeting, and when this failed, successfully excluded citizens and the media from the meeting, where, presumably, the bill was discussed. Assuming that the bill in question was not discussed at the luncheon meeting on August 12, the only open meeting on record with any discussion of Bill 02–0654 is the evening meeting on August 12, where the Council voted on the bill.

The Council effectively prevented members of the public from observing most of the deliberations on the issue, in direct contravention to the expressly stated policy of the Open Meetings Act. We hold that the Council willfully failed to comply with §§ 10–505 and 10–506 of the Open Meetings Act,

and that the appropriate remedy was to declare the action of the Baltimore City Council void.