913 A.2d 28

**J.P. DELPHEY LIMITED PARTNERSHIP**

v.

**MAYOR AND CITY OF FREDERICK.**

**No. 41, Sept. Term, 2006.**

Court of Appeals of Maryland.

Dec. 14, 2006.

Sterling G. Mead (Law Office of Sterling G. Mead, LLC, Rockville, on brief), for petitioner.

Christopher J. Heffernan (Richard A. Dubose, III, Niles, Barton & Wilmer, LLP, Baltimore, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

Petitioner, J.P. Delphey Limited Partnership, seeks relief from a judgment of the Court of Special Appeals affirming the condemnation of the Delphey property by the City of Frederick. We granted certiorari to consider the Petitioner's two questions, 393 Md. 477, 903 A.2d 416 (2006), to which we have added a third question and renumbered, in order to illuminate all of the issues raised in Delphey's petition, which include:

1. Whether, pursuant to Ann.Code MD Art. 23A § 2(b)(24), the City of Frederick was required to enact an ordinance specific to the property sought to be acquired by condemnation?

2. As a matter of first impression, whether the City of Frederick violated the Ann.Code of MD Art. 23A § 8 in finally deciding to condemn real property at a closed executive session?

3. Whether the City of Frederick violated Section 10–508(a)(3) of the Open Meetings Act in finally deciding to condemn real property at a closed session?

We shall hold that the City of Frederick was not required to enact an ordinance, or any legislation, specific to Delphey's property in order to acquire the property by condemnation and that the City did not violate either Section 10–508 of the Open Meetings Act, State Government Article, Maryland Code (1984, 1995 Repl.Vol.), or Section Eight of Article 23A, Maryland Code (1957, 2001 Repl. Vol.), when it voted to condemn Delphey's property during a closed session.

## I. Facts

Since 1997, and on an annual basis thereafter, the Mayor and Board of Aldermen[1] of the City of Frederick have approved the allocation of funds in the City's five-year budget for the construction of a "fourth parking deck"[2] within the City's limits.[3] As a result of a parking study undertaken in 1989, the search for the site of the fourth deck was focused

---

1. Article 2, Section 7 of the Frederick City Charter provides, in pertinent part, that "[a]ll legislative powers of the city shall be vested in a board of aldermen consisting of five (5) aldermen."

Article 2, Section 12 of the Frederick City Charter provides that "[t]he mayor shall serve as the president of the board of aldermen. He shall have no vote on any matter except when the board of aldermen is equally divided, in which case he shall cast the deciding vote."

2. In this opinion we have characterized the structure as a parking "deck" to comport with the language of the budget although the facility is more akin to a parking "garage" because of its proposed multiple levels. See Random House Dictionary of the English Language 517, 787 (2nd Ed.1987) (defining a deck as "an open, unroofed porch or platform extending from a house or other building", and a garage as "a building or indoor area for parking").

3. Article 5, Section 92 of the Frederick City Charter requires that "[t]he budget ... be prepared and adopted in the form of an ordinance."

"Parking Deck No. 4." appears on the five-year budgets for the fiscal years 1998–2003, 1999–2004, 2000–2005, 2001–2006, 2002–2007, 2003–2008, 2004–2009, and 2005–2010 as Item number 380401, for which was allotted $6,550,00.00.

upon East Patrick Street in the vicinity of the Frederick County Courthouse.

The City commissioned a Garage Site Evaluation Study in 1999 to analyze potential sites within this area, as well as the cost and impact[4] of the construction of the new parking deck. The Study recommended 134 through 140 West Patrick Street, a property owned by Delphey,[5] as the site "having the least negative impact on downtown Frederick while yielding the greatest benefit."[6]

On August 9, 2000, the Mayor and Aldermen held an executive session during which they voted to move forward with the purchase of land adjacent to the courthouse and commissioned an appraisal of the property owned by Delphey; the property subsequently was appraised for $1,200,000.00. In October, 2000, the Mayor tried to purchase the property for $1,200,000.00, but Delphey rejected the offer, stating that it was "unacceptable," and counter-offered to sell the property for a minimum of $3,000,000.00.

In 2001, the Mayor and Aldermen created a Parking Task Force which produced a Downtown Parking Plan confirming the 1999 Garage Site Evaluation Study's selection of the Delphey property as the best site and recommending that the City acquire the necessary property to construct the new parking deck as soon as possible, and, if condemnation were

---

**4.** By "impact," the study referred both to the visual impact of the garage—whether a particular site allowed for the garage to be hidden behind existing structures—and historic impact—whether the selection of a particular site would require the destruction of a historic building.

**5.** Delphey's property at 134 through 140 West Patrick Street is located adjacent to the County Courthouse and is used as a parking lot.

**6.** The selection of the Delphey site as the leading contender for the parking garage garnered a lot of attention from the local newspaper. *See* Ike Wilson, *City Favors Delphey site for new deck*, Frederick Post, Aug. 26, 1999 ("At an informal workshop meeting, the board of aldermen favored an area near the Delphey's parking lot behind Frederick County Courthouse off Court Street for the proposed four-story, 600–space deck."); *City, county own most land for deck*, Frederick Post, Sept. 2, 1999 ("[I]t additional land is needed, the Delphey property would be acquired. . . .").

necessary, to begin the process immediately. The Mayor and Aldermen adopted those recommendations during a meeting open to the public on September 6, 2001. At another public meeting in April, 2002, the Mayor and Aldermen approved the "Deck 4 Parking Agreement," a finance agreement between the City and Frederick County for the construction of the new parking garage which incorporated Delphey's property as the site selected for construction of the new deck. In September, 2002, after the Delphey property was reappraised for $1,675,000.00, the Mayor and Aldermen extended another offer to Delphey in that amount, plus $200,000.00 for relocation fees and $50,000.00 to sign the agreement. Maintaining that the property was worth over $3,000,000.00, Delphey responded to this second offer by letter, stating, "considering how far apart we are at this time, we respectfully reject this offer."

On November 5, 2002, the Mayor released a media advisory announcing that, pursuant to Section 10–508(a)(1), (3) and (8) of the State Government Article,[7] she would request a vote to close the end of the regularly scheduled November 6, 2002, meeting of the Mayor and Board of Aldermen, to discuss a

---

**7.** Section 10–508(a)(1), (3) and (8) of the State Government Article provides:

(a) *In general.*—Subject to the provisions of subsection (d) of this section, a public body may meet in closed session or adjourn an open session to a closed session only to:

(1) discuss:

(i) the appointment, employment, assignment, promotion, discipline, demotion, compensation, removal, resignation, or performance evaluation of appointees, employees, or officials over whom it has jurisdiction; or

(ii) any other personnel matter that affects 1 or more specific individuals;

\* \* \*

(3) consider the acquisition of real property for a public purpose and matters directly related thereto;

\* \* \*

(8) consult with staff, consultants, or other individuals about pending or potential litigation.

Maryland Code (1984, 1995 Repl.Vol.), Section 10–508(a)(1), (3) and (8) of the State Government Article.

personnel matter, consult with the city attorney on potential or pending litigation, and to discuss the acquisition of the Delphey property. Media Advisory, "Mayor Calls Executive Session To Follow Regularly Scheduled Mayor and Board Of Aldermen Workshop," November 5, 2002. The minutes of the November 6 closed session reflect the following:

**Delphey's Acquisition/Condemnation—Parking Deck # 4:**

[The City's Counsel] provided a written history of the City's efforts to solve the short term parking problems in downtown. A Garage Site Evaluation Study and phase II of the Parking Master Plan identify the Delphey's location as the # 1 solution. In August of 2000 the first appraisal of the property was appraised at $1,200,000. A number of attempts to negotiate and reach an agreement with the owners were made but the Delphey's continued to imply they need over $3,000,000.00. The Delphey Partnership has never supplied an appraisal to support their position. In the Summer of 2002 the City agreed to get a new appraisal, which came to $1,675,000. After another negotiation session, the first formal written offer was made on September 27, 2002 for $50,000 to sign the agreement, $200,000 for relocation expenses, and $1,675,000 for the real estate. There was also a request from the partnership that the Deck be named Delphey's Deck. On October 24, 2002, the Delphey's turned down the City's offer.

Mayor Dougherty asked what steps are taken to proceed with condemnation and could condemnation be stopped if a settlement is reached. [The City's Counsel] said condemnation could be stopped if a settlement is reached. [The City's Counsel] suggested that the first step would be to hire outside counsel to work on this case. A formal filing is made, there is a series of discovery made and the Delphey's would have to justify what they are asking. Alderman Lenhart asked if the City could add an incremental fee to the parking deck and for a period of 10 years provide that fee directly to the Delphey Trust so that the cost would be distributed over a longer period of time. There was addi-

tional discussion of the possibility of this option. [The City's Counsel] said that during negotiations other payment options were discussed. There was discussion as to how the City could offer more than the appraised value of the property. It was suggested that perhaps condemnation would bring this situation to more serious negotiations on the Delphey's part. [The City's Counsel] explained the formal actions needed for a condemnation process. In court the property owner is given the fair appraised value of the property. There was discussion of increase in the appraised value over the past two years. Alderman Lenhart said that he would be inclined not to condemn at this time if an annuity plan is offered. Alderman Baldi recommended continuing negotiations but moving ahead with the condemnation because the condemnation proceeding can be stopped. Alderman M. Hall mentioned that the appraised value continues to rise and the Board of Alderman needs to stop that from happening. When asked if the Delphey's are aware of the condemnation [The City's Counsel] said that they are aware that the City needs this property and that condemnation is an option that the City has. There was again discussion of payment options. Alderman Lenhart said that he could support condemnation provided that it is open to paying the Delphey's more money than the appraised value provided that money comes from future parking revenue which are above and beyond what the City needs to operate the fund. Mayor Dougherty and Alderman Baldi said that the condemnation goes to court and the court determines that amount.

The Aldermen then voted unanimously to begin condemnation proceedings with regard to the Delphey property.

The Mayor and City of Frederick subsequently filed a complaint in the Circuit Court for Frederick County to initiate the condemnation process, to which Delphey responded by filing a motion to dismiss, contending that the City did not have the authority to condemn the property because no ordinance specific to the Delphey property had been passed; Delphey's motion was denied. Delphey subsequently filed a

motion for summary judgment alleging that the closed session in which the Mayor and Aldermen decided to condemn the property violated Section 8 of Article 23A of the Maryland Code (1957, 2001 Repl.Vol.)[8] and the Open Meetings Act codified in Sections 10–501 through 10–512 of the State Government Article of the Maryland Code (1984,1995 Repl.Vol.).[9] The City of Frederick responded that the session did not violate the Open Meetings Act because, pursuant to Section 10–508(a)(3), closed executive sessions are permitted to consider the purchase of real property. The City also argued that the motion for summary judgment should be denied because Delphey had failed to comply with Section 10–510 of the Act,[10]

---

**8.** All references hereinafter to Section 8 of Article 23A are to the Maryland Code (1957, 2001 Repl.Vol.), which provides:

All meetings, regular and special, of the legislative body, by whatever name known, in every municipal corporation in Maryland, including the City of Baltimore, shall be public meetings and open to the public at all times. Nothing contained herein shall be construed to prevent any such body from holding an executive session from which the public is excluded but no ordinance, resolution, rule or regulation shall be *finally adopted* at such an executive session.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 8 (emphasis added).

**9.** All references hereinafter to the Open Meetings Act are to Maryland Code (1984, 1995 Repl.Vol.), Sections 10–501, *et seq.* of the State Government Article.

**10.** Section 10–510 of the Open Meetings Act provides in relevant part:

(b) *Petition authorized.*—(1) If a public body fails to comply with § 10–505, § 10–506, § 10–507, § 10–508, or § 10–509(c) of this subtitle and a person is affected adversely, the person may file with a circuit court that has venue a petition that asks the court to:

(i) determine the applicability of those sections;

(ii) require the public body to comply with those sections; or

(iii) void the action of the public body.

(2) If a violation of § 10–506, § 10–508, or § 10–509(c) of this subtitle is alleged, the person shall file the petition within 45 days after the date of the alleged violation.

(3) If a violation of § 10–505 or § 10–507 of this subtitle is alleged, the person shall file the petition within 45 days after the public body includes in the minutes of an open session the information specified in § 10–509(c)(2) of this subtitle.

Maryland Code (1984, 1999 Repl.Vol.), Section 10–510 of the State Government Article.

which requires that complaints for failure to comply with the Act be filed within 45 days of the alleged violation. The Circuit Court (Debelius, J.) denied summary judgment, concluding that Delphey had failed to file the petition for enforcement of the Open Meetings Act within the 45 day period provided by the statute.

Before trial, the judge also heard oral argument on whether the City possessed the requisite authority to condemn the Delphey property. Delphey asserted that the condemnation proceeding had been brought improperly because no ordinance specific to the property had been enacted as required by Section § 2(b)(24) of Article 23A, and that the City violated Section 8 of Article 23A by voting to condemn the Delphey property in a closed, executive session. The City responded that it acted pursuant to Section 173 of the City Charter, which granted the Mayor and Aldermen the authority to condemn properties, so that no ordinance specific to the property was required. After a hearing, the judge ruled that the City was entitled to condemn the Delphey property. A six-person jury subsequently rendered an inquisition,[11] setting Delphey's total damages to be $1,015,000.00, and the court issued an order that, upon payment of the damages, title in the property should vest in the City of Frederick.

Delphey noted a timely appeal to the Court of Special Appeals, alleging that the City of Frederick was required under Section 2(b)(24) of Article 23A to pass an ordinance specific to its property before commencing the condemnation process, and that the Mayor and Aldermen were prohibited from voting to condemn the property in a closed, executive meeting. In an unreported opinion the intermediate appellate court affirmed the trial court and held that neither Section

---

11. "An inquisition is a 'special verdict' rendered by the trier of fact in a condemnation action that 'shall set forth the amount of any damages to which each defendant or class of defendants is entitled or, if the court so orders, the total amount of damages awarded or both.' " *Bryan v. State Rds. Comm'n,* 356 Md. 4, 6 n. 1, 736 A.2d 1057, 1058 n. 1 (1999), citing Maryland Rule 12–208(d).

2(b)(24) of Article 23A [12] nor Section 173 of the Frederick City Charter [13] require the enactment of ordinances specific to the property to be condemned. The Court of Special Appeals further concluded that the condemnation of the Delphey property constituted an executive, not a legislative, action and therefore, did not require the passage of an ordinance specific to the property.[14]

Before this Court, Delphey contends that the City of Frederick was prohibited under both Section 8 of Article 23A, and by Section 10–508(a)(3) of the Open Meetings Act, from making its final decision to condemn Delphey's property during a closed session on November 6, 2003. Delphey further asserts that the condemnation of property constitutes a legislative act under Section 2(b)(24) of Article 23A and therefore requires

---

**12.** Section 2(b)(24) of Article 23A provides:

(b) *Express powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers:

\* \* \*

(24) To acquire by conveyance, purchase or *condemnation* real or leasehold property needed for any public purpose; to erect buildings thereon for the benefit of the municipality; and to sell at public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use.

Maryland Code (1981, 2001 Repl.Vol.), Article 23A Section 2(b)(24) (emphasis added).

**13.** Section 173 of the Frederick City Charter gives the City the "power to condemn any property, right, or interest belonging to any person, persons, corporation, or corporations for the purpose of making any public improvement."

**14.** The Court of Special Appeals did not reach the issue of whether the Aldermen violated Section 8 of Article 23A when they decided to move forward with the condemnation proceedings during a closed, executive session, stating:

Because an ordinance to condemn Delphey's property was neither required nor adopted, Delphey's remaining argument-that, under Article 23A § 8, an ordinance cannot be adopted in a closed session-collapses for want of the necessary premise.

the passage of an ordinance specific to each property being condemned.

Conversely, the City of Frederick argues that the Mayor and Aldermen were acting pursuant to the authority of two separate ordinances, Section 173 of the City Charter, which grants the City the power to condemn, as well as the City's five-year budget, which was adopted by ordinance, when the City made the decision to condemn the Delphey property, and that the decision constituted an executive, and not legislative, act and therefore did require the passage of an ordinance specific to the property. Further, the City asserts that, because the condemnation constituted an executive action, the City did not violate Section 8 of Article 23A, which only precludes legislative acts from being taken during closed, executive sessions. The City also contends that Section 10–508(a)(3) of the Open Meetings Act authorizes the Mayor and City to consider the purchase of real property during closed, executive sessions, and therefore the City complied with the provisions of the Act.

## II. Analysis

### A. Whether An Ordinance Specific To The Property Was Required

■ Delphey argues that Section 2(b)(24) of Article 23A required that the Aldermen enact an ordinance specific to 134 through 140 West Patrick Street before initiating the condemnation process because the decision to condemn is a legislative, and not executive, act, citing *Inlet Associates v. Assateague House Condominium Ass'n,* 313 Md. 413, 545 A.2d 1296 (1988), ("Inlet"), as authority. We agree that condemnation is a legislative function; we disagree with Delphey that an ordinance specific to each property is required in order to condemn, but note that, even if a legislative act specific to each property was required, that the Aldermen, as a legislative body, did vote to condemn the Delphey property on November 6, 2003, in a closed session.

The City of Frederick was incorporated as a municipality in 1816 pursuant to Chapter 74 of the Acts of 1816. As a municipality, it is governed by Article 23A, the first section of which provides:

The inhabitants of every incorporated municipality in Maryland constitute and shall continue to be a body corporate, and under the corporate name shall have perpetual succession, may sue and be sued, and may pass and adopt all ordinances, resolutions or bylaws necessary or proper to exercise the powers granted herein or elsewhere.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 1. Section 2 of Article 23A enumerates the express ordinance-making powers conferred in Section 1 and states:

(a) *General authority.*—The *legislative body* of every incorporated municipality in this State, except Baltimore City, by whatever name known, shall have general power to pass such *ordinances* not contrary to the Constitution of Maryland, public general law, or, except as provided in § 2B of this article, public local law as they may deem necessary. . . .

(b) *Express powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, *such legislative body* also shall have the following express *ordinance*-making powers:

\* \* \*

(24) To acquire by conveyance, purchase or *condemnation* real or leasehold property needed for any public purpose; to erect buildings thereon for the benefit of the municipality; and to sell at public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 2 (emphasis added).

The plain language of Section 2(b) confers the power of condemnation on the *legislative body* of the municipality. Section 7 of Article 2 of the City of Frederick Charter vests "[a]ll legislative powers of the city" in the Aldermen, and Section 173 of Article Fourteen of the Charter also authorizes the Aldermen to:

condemn any property, right, or interest belonging to any person, persons, corporation, or corporations for the purpose of making any public improvement.

Thus, pursuant to the express grant of authority of Section 2(b)(24) of Article 23A and Section 173 of the City of Frederick Charter, the Aldermen, acting in their legislative capacity, possessed the requisite authority to condemn the Delphey property specifically when they so voted in the November 6 closed, executive session. Whether they styled the result as an ordinance is of no moment, nor whether the session was characterized as "executive;" the action taken by the Aldermen was legislative within the meaning of the Section 2 of Article 23A.

Delphey, however, cites *Inlet, supra,* as authority for its contention that an enabling ordinance specific to the property is required to condemn. Delphey misconstrues *Inlet.*

*Inlet,* which does not even pertain to a condemnation, held that the *substance* of the Ocean City Council's actions conveying property did not comply with the requirements of Article 23A and the Ocean City Charter for an ordinance conveying City property. *Inlet* involved an agreement by Ocean City to *convey* twenty-five feet of a city street and its appurtenant riparian rights to Inlet, a private corporation, in exchange for Inlet's agreement to develop and maintain the property. Section 2(b)(24) of Article 23A authorizes municipalities

to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 2(b)(24). This Court, in an opinion by Chief Judge Robert

Murphy, first emphasized that it is the substance of the City Council's action which determines its legality:

considering the legality of the action taken by the City Council in this case, therefore, and in particular whether in the circumstances the conveyances could properly be authorized by resolution, we look to the *substance* of what the City Council undertook to achieve by its action.

*Inlet,* 313 Md. at 430, 545 A.2d at 1305 (emphasis added). The Court then pointed out that the "conveyance of the City's interest in the [property] solely for the private benefit of another, is not within the legislative body's power," and went on to state that both the Ocean City Charter and Section 2(b)(24) of Article 23A required that the Ocean City Council affirmatively make a determination that "there is no longer any public need for the street" before undertaking the conveyance, and that the Council's actions failed to comply with this requirement. *Id.* at 431, 545 A.2d at 1305. The Court also stated that an ordinance conveying property was required to be signed by the Mayor or passed over the Mayor's veto, and that the City Council's actions failed to meet this requirement. *Id.* at 433–34, 545 A.2d at 1306. The *Inlet* opinion concluded that:

Considering the central involvement of South Division Street and the waters of the bay in Inlet's proposal, and the magnitude of the property interest involved (City property of estimated value approximating one million dollars), a simple resolution, *neither reduced to writing nor journalized as required by the City Charter,* cannot suffice to validate the City's actions. An ordinance was thus fundamental to the legality of the conveyances here in question; without it, the City Council's action was without legal effect.

*Id.* (emphasis added).

The record is devoid in the present case of any evidence that the actions of the Mayor and Aldermen of the City of Frederick failed to comply with Article 23A and Charter requirements for the condemnation of property, which is a failure of proof on the part of Delphey, the movant for

dismissal and summary judgment in which the City's authority was challenged. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 206, 680 A.2d 1067, 1078 (1996) (stating that moving party bears initial burden of proof). As a result, Delphey's reliance on *Inlet* is misplaced.

In recognizing that the Mayor and Aldermen did act legislatively in condemning the specific Delphey property, we do not hold that a property specific ordinance, or legislative act, is always required in order to condemn. In fact, our jurisprudence supports the opposite conclusion.

In *Anne Arundel County v. Bowen,* 258 Md. 713, 267 A.2d 168 (1970), and *Boswell v. Prince George's County,* 273 Md. 522, 330 A.2d 663 (1975), this Court held that no ordinances specific to the properties being condemned were required when legislative authorization had previously been granted. In *Bowen,* the respondents challenged the County Executive's authority to condemn their property because no ordinance had been passed by the County Council specific to their property. We affirmed the condemnation because the County Council had set aside funds in the annual budget for the construction of the road for which the respondents' property was being condemned, and therefore the condemnation had been legislatively authorized. *Bowen,* 258 Md. at 720, 267 A.2d at 171. In *Boswell,* we again affirmed a condemnation executed by the Prince George's County Executive and held that no ordinance specific to property was required because the project was already authorized by the county council in the annual budget and therefore the "proper legislative authorization for this project existed." 273 Md. at 533, 330 A.2d at 670.

In the case *sub judice,* the decision to utilize the City's condemnation power in order to acquire the Delphey property was approved by the Mayor and reduced to writing in the minutes and represented the consummation of a long history of legislative actions taken to secure the best site for the construction of a new parking deck, to include: adoption by ordinance, in open meetings, a five-year budget every year since 1989 allotting funds for the construction of the new

parking deck; in 1999, again in an open meeting, commissioning a Garage Site Evaluation Study, which recommended the Delphey property as the best location for the new parking deck; in 2001, again in an open meeting, assembling the Parking Task Force which confirmed the selection of the Delphey location in its Downtown Parking Plan; commissioning two separate appraisals of the Delphey property, and; in 2002, again in an open meeting, approving the Deck 4 Parking Agreement, a finance agreement between the City and the County. We therefore hold that Aldermen's vote in the November 6, 2002 meeting constituted sufficient authority for the City to condemn the Delphey property.

## II. Section 10–508 Of The Open Meetings Act And Section 8 Of Article 23A

 Delphey also contends that the Mayor and Aldermen's vote to condemn Delphey's property in a closed session violated both Section 10–508(a)(3) of the Open Meetings Act, which permits the Mayor and Aldermen to "consider" the acquisition of real property in closed, executive meeting,[15] and also Section 8 of Article 23A, which prohibits the adoption of any rule, regulation, resolution or ordinance during a closed, executive session. The City responds that Article 8 only

---

15. The City further claims that Delphey failed to raise the issue of the Open Meetings Act in its petition for writ of certiorari and therefore is barred under Maryland Rule 8–131(b) from raising it now.
 Maryland Rule 8–131(b) provides in pertinent part:
 Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals.
 Md. Rule 8–131(b). In the case *sub judice*, the issue of whether the City also violated the Open Meetings Act is not a separate and distinct issue from the issue of whether the City violated Section 8 of Article 23A. To the contrary, the Open Meetings Act was an integral part of Delphey's argument at the trial level and is inextricably interrelated to whether the City violated Section 8 of Article 23A. We therefore will reach the issue of whether the City violated the Open Meetings Act. *See Eid v. Duke*, 373 Md. 2, 10–11, 816 A.2d 844, 849 (2003).

prohibits the City from taking legislative, and not executive actions during closed session, and also that it was authorized by Section 10–508(a)(3) to vote in the closed session to condemn the Delphey property.

The Frederick City Charter provides that "[a]ll regular and special meetings shall be open to the public as required pursuant to the Open Meetings Act, codified at Annotated Code of Maryland, State Government Article, Section 10–501 through 10–512." City of Frederick Charter, Article 2, Section 10. Section 10–501 of the Open Meetings Act provides in pertinent part:

(a) *In general.*—It is essential to the maintenance of a democratic society that, except in special and appropriate circumstances:

(1) public business be performed in an open and public manner; and

(2) citizens be allowed to observe:

(i) the performance of public officials; and

(ii) the deliberations and decisions that the making of public policy involves.

Maryland Code (1984, Repl.Vol.1995), Section 10–501(a) of the State Government Article. As an exception to this general rule, however, Section 10–508, "Closed sessions permitted," provides:

(a) *In general.*—Subject to the provisions of subsection (d) of this section, a public body may meet in closed session or adjourn an open session to a closed session only to:

\* \* \*

(3) consider the acquisition of real property for a public purpose and matters directly related thereto;

\* \* \*

(b) *Limitation.*—A public body that meets in closed session under this section may not discuss or *act on* any matter *not permitted under subsection (a)* of this section.

(c) *Construction.*—The exceptions in subsection (a) of this section shall be strictly construed in favor of open meetings of public bodies.

Maryland Code (1984, Repl.Vol.1995), Section 10–508 of the State Government Article (emphasis added).

As a municipality, however, the City of Frederick also is subject to the provisions of Section 8 of Article 23A, which provides:

All meetings, regular and special, of the legislative body, by whatever name known, in every municipal corporation in Maryland, including the City of Baltimore, shall be public meetings and open to the public at all times. Nothing contained herein shall be construed to prevent any such body from holding an executive session from which the public is excluded but no ordinance, resolution, rule or regulation shall be *finally adopted* at such an executive session.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 8 (emphasis added).

Meetings of the Mayor and Aldermen of the City of Frederick, therefore, are governed by the provisions of both Section 8 of Article 23A and Section 10–508 of the Open Meetings Act. Clearly, however, these two statutes conflict. The language of Section 8 of Article 23A is very broad, prohibiting the Aldermen from passing *any* rule, regulation, resolution or ordinance in *any* closed, executive session, regardless of the circumstances under which the meeting is called or the subject matter to be discussed therein, while the language of Section 10–508(a)(3) of the Open Meetings Act is very specific, carving out an exception to Section 10–501's general mandate that all meetings of public bodies be kept open to the public by permitting meetings to be closed to facilitate the consideration of "the acquisition of real property for a public purpose and matters directly related thereto."

It is a well-settled rule of statutory interpretation that "when two statutes, one general and one specific, are found to conflict, the specific statute will be regarded as an exception to

the general statute." *Md.-Nat'l Capital Park and Planning Comm'n v. Anderson*, 395 Md. 172, 194, 909 A.2d 694, 707 (2006); *Massey v. Sec'y, Dep't of Pub. Safety and Corr. Servs.*, 389 Md. 496, 512 n. 4, 886 A.2d 585, 594 n. 4 (2005), citing *Smack v. Dep't of Health and Mental Hygiene*, 378 Md. 298, 306, 835 A.2d 1175, 1179 (2003); *Harvey v. Marshall*, 389 Md. 243, 270, 884 A.2d 1171, 1187 (2005); *Farmers & Merchants Nat'l Bank of Hagerstown v. Schlossberg*, 306 Md. 48, 63, 507 A.2d 172, 180 (1986); *Lumbermen's Mut. Cas. Co. v. Ins. Comm'r*, 302 Md. 248, 268–69, 487 A.2d 271, 281 (1985). Thus, under our well-established rule of statutory interpretation, we reconcile the two statutes by interpreting the more specific provisions of Section 10-508(a)(3) of the Open Meetings Act as providing an exception to the very broad prohibitions articulated in Section 8 of Article 23A. *See Md.-Nat'l Capital Park and Planning Comm'n*, 395 Md. at 194, 909 A.2d at 707; *Massey*, 389 Md. at 512 n. 4, 886 A.2d at 594 n. 4; *Harvey*, 389 Md. at 270, 884 A.2d at 1187; *Smack*, 378 Md. at 306, 835 A.2d at 1179.

■ In addressing the issue of whether the Aldermen could vote to condemn the Delphey property on November 6, 2002, during a closed session, we are called upon to construe Section 10–508 of the Open Meetings Act. When tasked with interpreting provisions of the Open Meetings Act in previous cases, we have repeatedly underscored the important policy the Act serves to protect. In *City of New Carrollton v. Rogers*, 287 Md. 56, 410 A.2d 1070 (1980), Chief Judge Murphy, again writing for this Court, expounded upon the touchstone of the Act, stating:

[T]he heart of the Act is found in the public policy declarations of [the Act], i.e., that "public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials (when exercising legislative, quasi-legislative or advisory functions) and the deliberations and decisions that go into the making of public policy." That commitment is secured by the provisions ... which require that notice of meetings be given and that the meetings be open to the public. While the Act does

not afford the public any right to participate in the meetings, it does assure the public the right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well as to all deliberations which precede the actual legislative act or decision, unless authorized by [Section 10–508] to be closed to the public. The Act makes no distinction between formal and informal meetings of the public body; it simply covers all meetings at which a quorum of the constituent membership of the public body is convened "for the purpose of considering or transacting public business." ... It is, therefore, the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business.

*Id.* at 71–72, 410 A.2d at 1078–79 (emphasis removed).

In *Community and Labor United For Baltimore Charter Committee (CLUB) v. Baltimore City Board of Elections,* 377 Md. 183, 832 A.2d 804 (2003), we held that the Baltimore City Council had violated the Open Meetings Act when it discussed the drafting of a bill during meetings for which the Council had failed to give proper notice to the public, and explicated that "[t]he record does not provide any significant information about the deliberations that preceded the passage of this bill. On the contrary, the record shows that the City Council wished to conduct these deliberations away from the scrutiny of citizens and the media." *Id.* at 196, 832 A.2d at 811. We therefore concluded that, in so doing, "[t]he Council effectively prevented members of the public from observing most of the deliberations on the issue, in direct contravention to the expressly stated policy of the Open Meetings Act." *Id.* at 196, 832 A.2d at 812.

More recently, in *City of Baltimore Development Corp. v. Carmel Realty Assocs.,* 395 Md. 299, 910 A.2d 406 (2006), we

held that a corporation performing many of the functions of the Mayor and City Council of Baltimore constituted a "public body," as defined by Section 10–502(h) of the Act, and therefore was subject to the requirements of the Act and iterated that "[o]ne purpose of the government in the [Open Meetings Act] was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance." *Id.* at 321, 910 A.2d at 419 quoting *New Carrollton*, 287 Md. at 72, 410 A.2d at 1079, quoting in turn *Town of Palm Beach v. Gradison*, 296 So.2d 473, 477 (Fla.1974). Therefore, in furtherance of that stated purpose, we emphasized that the Act *"should be construed so as to frustrate all evasive devices." City of Balt. Dev. Corp.*, 395 Md. at 321, 910 A.2d at 419 (emphasis in original).

In the case *sub judice*, no such evasive devices have been exploited by the Aldermen in a very public campaign to construct a new parking deck. To the contrary, the Aldermen's decision to acquire the Delphey property for the purpose of constructing a new parking garage has conformed to the Act's stated policy of keeping the discussion of public business public from its inception, beginning with the allotment of funds in the City budget for construction of a new, fourth parking deck in 1998, and progressing to the public discussion of the Garage Site Evaluation Study in 1999, identifying the Delphey site as the best location for the parking deck, the adoption of the Downtown Parking Plan's recommendation to acquire or condemn that location as soon as possible during an open meeting on September 6, 2001, the adoption of the finance agreement between the City and the County, which again identified the Delphey site for the new garage, in an open meeting in April, 2002, and culminating in the Aldermen's November 6, 2002, vote to condemn the property.

Further, there is no ambiguity in the plain language of Section 10–508(b) of the Open Meetings Act; the provision clearly authorizes a public body to "discuss or *act on* any matter" listed under subsection (a), which includes "the acqui-

sition of real property for a public purpose and matters directly related thereto." Thus, there is no question that the Aldermen had the authority under Section 10–508(a)(3) to *act* upon the earlier, public decision to condemn Delphey's property in the closed November 6, 2002, session. The closure of the November 6 meeting therefore constituted a valid exercise by the Aldermen of the discretion granted by Section 10–508(a)(3) to consider the terms of the condemnation of the Delphey property.

We therefore hold that the Aldermen's vote to condemn the Delphey property constituted a proper exercise of the authority vested in that legislative body by Section 2(b)(24) of the Article 23A and Section 173 of the City Charter, and that no ordinance, or legislative act, specific to the property was required. We further conclude that the Aldermen did not violate Section 10–508(a)(3) of the Open Meetings Act, which provides an exception to the general prohibitions of Section 8 of Article 23A, when they voted to condemn the Delphey property in a closed session.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**

Judge CATHELL and Judge HARRELL join in the judgment only.